**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

—————————————————————— x
:
WABTEC CORPORATION              :
:
*Plaintiff,*          :
:
*and*             :                    Court No. 1:23-cv-00160
:
STRATO, INC.,                   :
:
*Plaintiff- Intervenor*     :
:
v.                    :
:
UNITED STATES,                  :
:
*Defendant,*         :
:
*and*             :
:
COALITION OF FREIGHT            :
COUPLER PRODUCERS,              :
:
*Defendant-*         :
*Intervenor.*        :
:
—————————————————————— x

## PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade,

Plaintiff Wabtec Corporation respectfully moves for judgment on the administrative

record. For the reasons set forth in the accompanying Memorandum of Law in

support of its motion, Wabtec requests that the Court determine that the U.S.

Department of Commerce's final affirmative determination in *Certain Freight Rail*

*Couplers and Parts Thereof From the People's Republic of China: Final Affirmative*

*Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances*, 88 Fed. Reg. 34,485 (May 30, 2023), and the accompanying *Issues and Decision Memorandum*,[1] is not supported by substantial evidence on the record and is otherwise not in accordance with law.

A proposed order accompanies this motion.

Respectfully submitted,

*/s/ David M. Morrell*
David M. Morrell
Ryan M. Proctor
Shelbie M. Rose

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated: January 22, 2024

---

[1] The IDM incorporates by reference the analysis in its *Final Scope Memorandum*, which Wabtec also challenges as unsupported by substantial evidence and otherwise not in accordance with law.  Appx6711; *see Final Scope Memorandum*, Appx6547.

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

```
_____ x
                                :
WABTEC CORPORATION              :
                                :
                    Plaintiff,  :
                                :
        and                     :          Court No. 1:23-cv-00160
                                :
STRATO, INC.,                   :
                                :
            Plaintiff- Intervenor :
                                :
        v.                      :
                                :
UNITED STATES,                  :
                                :
                    Defendant,  :
                                :
        and                     :
                                :
COALITION OF FREIGHT            :
COUPLER PRODUCERS,              :
                                :
                    Defendant-  :
                    Intervenor.  :
                                :
_____ x
```

**ORDER**

Upon consideration of the Motion for Judgment on the Administrative Record filed by Plaintiff Wabtec Corporation and upon all other papers and proceedings herein, the Court

**ORDERS** that Wabtec's Motion is granted; and further

**FINDS** that the final affirmative determination of the U.S. Department of Commerce ("Commerce") in *Certain Freight Rail Couplers and Parts Thereof From*

*the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances*, 88 Fed. Reg. 34,485 (May 30, 2023), is not supported by substantial evidence on the record, and is not otherwise in accordance with law; and further

**ORDERS** that this matter, Court No.1:23-cv-00160, is remanded to Commerce for reconsideration of the final affirmative determination in accordance with the decision of this Court.

**SO ORDERED.**

_____
Stephen Alexander Vaden, Judge

Dated: _____, 2024
      New York, New York

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

———————————————————— x
                          :

WABTEC CORPORATION          :

        *Plaintiff,*      :

   *and*            :    Court No. 1:23-cv-00160

STRATO, INC.,          :

     *Plaintiff- Intervenor* :   **PUBLIC VERSION**

   v.            :

UNITED STATES,       :   BUSINESS PROPRIETARY

      *Defendant,*    :   INFORMATION
                  :   REMOVED FROM PAGES
   *and*          :   23 & 26

COALITION OF FREIGHT  :
COUPLER PRODUCERS,   :

     *Defendant-*     :
     *Intervenor.*     :

———————————————————— x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

David M. Morrell
Ryan M. Proctor
Shelbie M. Rose

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated: January 22, 2024

PUBLIC VERSION

## TABLE OF CONTENTS

**Page**

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

    A.    Administrative Decision Under Appeal.................................................. 1

    B.    Reasons for Contesting the Administrative Decision ............................ 1

    C.    Issues Presented and Summary of Argument ....................................... 2

        1.    Did Commerce unlawfully permit relitigation of prior administrative determinations, including a recent final negative injury determination by the International Trade Commission? .................................................................................. 2

        2.    Did Commerce unlawfully include FRCs attached to railcars in the scope of the *Final Determination*? ........................ 3

STATEMENT OF FACTS ........................................................................................ 4

    A.    Commerce Initiates and Refuses to Terminate a Second Investigation into FRCs from China Without Finding Good Cause. ................................................................................................. 5

    B.    Commerce Includes Within Scope FRCs Already Attached to Railcars. ............................................................................................... 9

STANDARD OF REVIEW ..................................................................................... 12

ARGUMENT ......................................................................................................... 13

I.    Commerce Unlawfully Permitted Petitioner to Relitigate the Final Determinations in *FRC I*. ............................................................................. 13

    A.    Section 751(b)(4) Required the Dismissal or Termination of *FRC II*. ...................................................................................................... 14

        1.    Commerce did not find good cause under Section 751(b)(4), which was required to initiate *FRC II*. ..................... 14

        2.    Commerce's rationale for refusing to apply Section 751(b)(4) was flawed. ................................................................ 16

    B.    Commerce Had Authority to Terminate the Investigation. ................. 19

II.    Commerce Erred in Refusing to Exclude FRCs Attached to Railcars from the Scope. ....................................................................................... 22

    A.    As a Matter of Law, Couplers Attached to Railcars Cannot Be Within Scope Because the Underlying Theory of Injury Is Not Cognizable in These Antidumping Proceedings.................................... 22

**PUBLIC VERSION**

1.     Section 731 does not address lost sales in third countries, as the inclusion of attached FRCs within the scope was designed to do. ................................................................ 22

2.     Commerce improperly disclaimed authority to enforce the limits of the Tariff Act through a scope determination. ............ 26

B.    Commerce Erred in Analyzing Attached FRCs Apart from Railcars. .................................................................................. 32

C.    Commerce Unlawfully Found No Substantial Transformation. .......... 41

1.     Commerce failed to apply the proper legal standard. ................ 41

2.     Commerce's determination relied on flawed rationales and is unsupported by substantial evidence. ............................ 42

CONCLUSION ............................................................................................. 47

PUBLIC VERSION

## TABLE OF AUTHORITIES

Page(s)

CASES

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 31

*Bell Supply Co. v. United States*,
888 F.3d 1222 (Fed. Cir. 2018)................................................... 41, 42

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*,
331 U.S. 519 (1947) ........................................................................ 18

*Blaw Knox Const. Equip. Co. v. United States*,
8 CIT 210, 596 F. Supp. 476 (1984) .............................................. 20

*Brown v. GSA*,
425 U.S. 820 (1976) ........................................................................ 26

*Canadian Solar, Inc. v. United States*,
918 F.3d 909 (Fed. Cir. 2019)....................................................... 27

*Changzhou Trina Solar Energy Co. v. ITC*,
879 F.3d 1377 (Fed. Cir. 2018)..................................................... 24

*Chemours Co. FC LLC v. United States*,
393 F. Supp. 3d 1186 (CIT 2019) ........................................ 20, 35, 46

*City of Tacoma v. Taxpayers of Tacoma*,
357 U.S. 320 (1958) ................................................................. 16, 21

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........................................................................ 13

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)....................................... 12, 42, 44, 45

*Dell Prods. LP v. United States*,
642 F.3d 1055 (Fed. Cir. 2011)................................................. 35, 36

PUBLIC VERSION

*Diversified Prods. Corp. v. United States,*
  6 CIT 155, 572 F. Supp. 883 (1983) ........................................................ 34

*Duferco Steel, Inc. v. United States,*
  296 F.3d 1087 (Fed. Cir. 2002) .......................................................... 27, 40

*Elkem Metals Co. v. United States,*
  26 CIT 234, 193 F. Supp. 2d 1314 (2002) ............................................. 20

*Fag Kugelfischer Georg Schafer AG v. United States,*
  332 F.3d 1370 (Fed. Cir. 2003) ............................................................. 13

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ............................................................................... 42

*Gilmore Steel Corp. v. United States,*
  7 CIT 219, 585 F. Supp. 670 (1984) ................................................. 19, 20

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) ................................................................................. 15

*Hernandez v. Mesa,*
  140 S. Ct. 735 (2020) ............................................................................ 26

*Home Prods. Int'l, Inc. v. United States,*
  633 F.3d 1369 (Fed. Cir. 2011) ............................................................. 20

*Houston Oil & Ref., Inc. v. FERC,*
  95 F.3d 1126 (Fed. Cir. 1996) ............................................................... 40

*King Supply Co. v. United States,*
  674 F.3d 1343 (Fed. Cir. 2012) ............................................................. 27

*Kokusai Elec. Co. v. United States,*
  10 CIT 166, 632 F. Supp. 23 (1986) ...................................................... 20

*M S Int'l, Inc. v. United States,*
  32 F.4th 1145 (Fed. Cir. 2022) ................................................... 27, 28, 31

*MacLean Power, L.L.C. v. United States,*
  359 F. Supp. 3d 1367 (CIT 2019) .................................................*passim*

*Matsushita Elec. Indus. Co. v. United States,*
  750 F.2d 927 (Fed. Cir. 1984) .............................................................................. 13

*Mittal Steel Point Lisas Ltd. v. United States,*
  542 F.3d 867 (Fed. Cir. 2008) .......................................................................... 32, 44

*Mosaic Co. v. United States,*
  659 F. Supp. 3d 1285 (CIT 2023) ......................................................................... 40

*NSK Ltd. v. United States,*
  390 F.3d 1352 (Fed. Cir. 2004) ........................................................................ 27, 29

*Oracle Am., Inc. v. United States,*
  975 F.3d 1279 (Fed. Cir. 2020) ............................................................................ 47

*Oy v. United States,*
  61 F.3d 866 (Fed. Cir. 1995) ................................................................................ 29

*Pomeroy Collection, Ltd. v. United States,*
  32 CIT 526, 559 F. Supp. 2d 1374 (2008) ............................................................. 35

*Rollerblade, Inc. v. United States,*
  112 F.3d 481 (Fed. Cir. 1997) .......................................................................... 35, 44

*S. Pac. R. Co. v. United States,*
  168 U.S. 1 (1897) ................................................................................................. 21

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco,*
  545 U.S. 323 (2005) ............................................................................................. 21

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ............................................................................................... 41

*Simod Am. Corp. v. United States,*
  872 F.2d 1572 (Fed. Cir. 1989) ............................................................................ 35

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
  966 F.2d 660 (Fed. Cir. 1992) .............................................................................. 30

*Tokyo Kikai Seisakusho, Ltd. v. United States,*
  529 F.3d 1352 (Fed. Cir. 2008) ............................................................................ 20

PUBLIC VERSION

*Torrington Co. v. United States*,
   14 CIT 507, 745 F. Supp. 718 (1990) ..................................................... 40

*Torrington Co. v. United States*,
   16 CIT 71, 786 F. Supp. 1016 (1992) ..................................................... 33

*Trendium Pool Prods., Inc. v. United States*,
   399 F. Supp. 3d 1335 (CIT 2019) ..................................................... 46, 47

*Tung Fong Indus. Co. v. United States*,
   29 CIT 346, 366 F. Supp. 2d 1308 (2005) ..................................................... 20

*Uniden Am. Corp. v. United States*,
   24 CIT 1191, 120 F. Supp. 2d 1091 (2000) ..................................................... 41

*United States v. Citroen*,
   223 U.S. 407 (1911) ..................................................... 4, 35

*United States v. Morales*,
   807 F.3d 717 (5th Cir. 2015) ..................................................... 17

*Viraj Forgings, Ltd. v. United States*,
   27 CIT 1472, 283 F. Supp. 2d 1335 (2003) ..................................................... 44

*Wall v. Kholi*,
   562 U.S. 545 (2011) ..................................................... 17

*Win-Tex Prod., Inc. v. United States*,
   17 CIT 786, 829 F. Supp. 1349 (1993) ..................................................... 6

**STATUTES**

19 U.S.C. § 1516a ..................................................... 6, 7, 12, 15

19 U.S.C. § 1671d ..................................................... 14, 18

19 U.S.C. § 1673 ..................................................... *passim*

19 U.S.C. § 1673a ..................................................... *passim*

19 U.S.C. § 1673d ..................................................... *passim*

19 U.S.C. § 1675 ..................................................... *passim*

PUBLIC VERSION

19 U.S.C. § 1677................................................................................................ 33, 40

19 U.S.C. § 1677k............................................................................................. 25, 26

19 U.S.C. § 2541................................................................................................... 25

Fed. R. Civ. P. 12.................................................................................................. 31

ADMINISTRATIVE MATERIALS

19 C.F.R. § 141.4............................................................................................. 37, 39

19 C.F.R. § 351.202.............................................................................................. 28

19 C.F.R. § 351.225.............................................................................................. 34

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (May 19, 1997)....................................... 24, 28, 29

*Certain Freight Rail Couplers and Parts Thereof from China,*
    88 Fed. Reg. 43,398 (July 7, 2023)............................................. 19

*Certain Freight Rail Couplers and Parts Thereof from Mexico,*
    88 Fed. Reg. 77,612 (Nov. 13, 2023)......................................... 19

*Certain Freight Rail Couplers and Parts Thereof From Mexico: Final*
    *Affirmative Determination of Sales at Less Than Fair Value and*
    *Final Negative Determination of Critical Circumstances,*
    88 Fed. Reg. 65,153 (Sept. 21, 2023)......................................... 19

*Certain Freight Rail Couplers and Parts Thereof From the People's*
    *Republic of China and Mexico: Initiation of Less-Than-Fair-Value*
    *Investigations,* 87 Fed. Reg. 64,444 (Oct. 25, 2022) ...................... 7

*Certain Freight Rail Couplers and Parts Thereof From the People's*
    *Republic of China: Final Affirmative Determination of Sales at Less-*
    *Than-Fair Value and Final Affirmative Determination of Critical*
    *Circumstances,* 88 Fed. Reg. 34,485 (May 30, 2023)............... 1, 3, 12, 47

PUBLIC VERSION

*Certain Softwood Lumber Products From Canada: Final Affirmative
     Determination of Sales at Less Than Fair Value and Affirmative
     Final Determination of Critical Circumstances*,
     82 Fed. Reg. 51,806 (Nov. 8, 2017) ........................................................... 33, 34, 50

*Freight Rail Coupler Systems and Components From China*,
     87 Fed. Reg. 41,144 (July 11, 2022) ........................................................... 5

ITC, *Certain Freight Rail Couplers and Parts Thereof from China*,
     Pub. No. 5438 (July 2023) ........................................................... 7

*Liquidation Instructions—Termination*,
     Bar Code 4271905-01, Inv. No. A-570-143 (Aug. 3, 2022) ....................................... 5

**OTHER AUTHORITIES**

*Oxford Dictionary of Philosophy* (3d ed. 2016) ........................................................... 43

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*
     (2012) ........................................................... 17

Plaintiff Wabtec Corporation submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A. ADMINISTRATIVE DECISION UNDER APPEAL

Wabtec is a U.S. importer of subject merchandise.  It seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") final affirmative less-than-fair-value determination for freight rail couplers ("FRCs") from the People's Republic of China ("China"), published as *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances*, 88 Fed. Reg. 34,485 (May 30, 2023) *("Final Determination"*), Appx6726,[1] and the accompanying *Issues and Decision Memorandum* ("IDM"), Appx6709.  The *Final Determination* arises from an investigation into freight rail couplers ("FRCs"), which commenced just two months after a negative injury determination and termination of an earlier investigation into FRCs, known as "*FRC I*."  The investigation in *FRC I* encompassed the same merchandise covered by the investigation under review here ("*FRC II*").

### B. REASONS FOR CONTESTING THE ADMINISTRATIVE DECISION

Wabtec's reasons for contesting the administrative decision are set forth in the

---

[1] In accordance with Section (d) of Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Rev'd Sept. 29, 2022), this brief cites the Bates numbers corresponding to the public record and confidential versions of the joint appendix and omits "PR" and "CR" style references.

Summary of Argument below, and in more detail in the Argument section of this Memorandum.

### C.   ISSUES PRESENTED AND SUMMARY OF ARGUMENT

**1.   Did Commerce unlawfully permit relitigation of prior administrative determinations, including a recent final negative injury determination by the International Trade Commission?**

Yes.  Commerce and the International Trade Commission ("ITC") "may not review a determination made under section … 1673d(b)" or "1673d(a)" within 24 months, absent a showing of "good cause."  19 U.S.C. § 1675(b)(4).  That includes both final affirmative and final negative determinations.  *See id.* § 1673(b)(1)(A).  Just weeks before the petition was filed in this case, the ITC made a final determination in *FRC I* that FRCs from China do not cause or threaten injury.  The present petition sought "review" of that determination, since success on its claim necessarily entailed nullifying the previous negative determination.  In particular, because the scope and periods of investigation for the two investigations overlapped, the Commission could not make an affirmative finding in *FRC II* without finding injurious *the very same imports* it found non-injurious in *FRC I*.  Since the petition identified (and Commerce found) no new developments justifying this collateral attack on the ITC's previous findings, Commerce should have dismissed the petition at initiation, or at least terminated the investigation once apprised of the issue.

In addition, Commerce has the inherent authority to guarantee the finality of its and the ITC's decisions.  This includes the power to insist that a petitioner establish good cause before seeking immediate relitigation of a previous

determination. Commerce failed to acknowledge it had this authority, and so at minimum must consider whether to exercise it in the first instance.

### 2. Did Commerce unlawfully include FRCs attached to railcars in the scope of the *Final Determination*?

Yes, for three independent reasons. *First*, antidumping duties can be imposed only where a domestic industry is injured "by reason of *imports* of {subject} merchandise." 19 U.S.C. § 1673(2) (emphasis added). That is, the *act of importing* the merchandise must be the but-for cause of the domestic industry's injury. Even accepting Petitioner's factual allegations as true, its theory of injury underlying this aspect of the scope—that including FRCs attached to railcars in third countries is necessary to address lost sales in Mexico—is not *legally cognizable* in these proceedings. At most, FRCs allegedly dumped into third countries where they are then attached to railcars cost the domestic industry *export* sales, which are not an injury cognizable under the antidumping statute here. Commerce therefore should have, as a matter of law, excluded such FRCs from the scope. Indeed, Commerce has a duty to tailor the scope of its investigation to Petitioner's legitimate theory of injury. Commerce failed to do so here.

*Second*, Commerce had no authority to consider attached FRCs apart from the railcars to which they are attached when defining the scope of the investigation. An antidumping order may cover only one "class or kind" of merchandise. *Id.* § 1673(1). Commerce determined that Petitioner's proposed scope complied with this principle because an attached FRC is of the same class or kind as an unattached FRC. But by definition, an attached FRC enters the country as *part of a railcar*. Thus, under the

longstanding general rule that merchandise must be assessed "in the condition in which it is imported," *United States v. Citroen*, 223 U.S. 407, 414–15 (1911), Commerce should have assessed whether a *completed railcar* is of the same class or kind as an FRC—which it plainly is not. In deciding otherwise, Commerce cited no legitimate exception to the general rule.

*Third*, Commerce's determination that FRCs do not undergo a substantial transformation when attached to a railcar was contrary to law and unsupported by substantial evidence. Commerce found that no substantial transformation occurs because FRCs have a shorter useful life than the railcar as a whole and because FRCs are not physically changed when attached. In doing so, it ignored and failed to apply the governing five-factor test for determining when a substantial transformation has occurred. In addition, Commerce's reasoning cannot stand because it would allow almost any input into an assembled product to become subject to antidumping duties, which is contrary to several decisions of this Court. Commerce also failed to identify substantial evidence for its factual finding that FRCs are not permanently attached to railcars and do not undergo physical changes when attached to railcars.

## STATEMENT OF FACTS

This case involves FRCs, which are used to connect freight railcars together. Appx2454. An FRC has four main components: (1) the knuckle, a hook-like steel casting that interlocks with the neighboring railcar's knuckle; (2) the coupler body, into which the knuckle is integrated; (3) the yoke, which houses the coupler body; and (4) the follower block, a rectangular piece of metal separating the coupler body and

yoke from certain adjacent parts of the railcar.  Appx1400, Appx2455.  Once installed, FRCs remain attached to the railcar for the rest of their useful life; they "are not removed until they are worn and/or damaged and need to be repaired or replaced." Appx3486

### A.  Commerce Initiates and Refuses to Terminate a Second Investigation into FRCs from China Without Finding Good Cause.

On September 29, 2021, Petitioner, a coalition of parties led by domestic manufacturer McConway and Torley, filed a petition seeking antidumping duties on imports of FRCs from China.  Appx1400.  In the ensuing investigation ("*FRC I*"), Petitioner argued that imports of Chinese FRCs had taken a significant share of the U.S. market by underselling their products and undercutting their rivals.  *See* Appx1406–1428.

By a 5-0 vote, the ITC disagreed, finding neither injury nor threat of injury from Chinese imports of FRCs.  Appx1433.  The Commission published a notice of its final determination on July 11, 2022, *Freight Rail Coupler Systems and Components From China*, 87 Fed. Reg. 41,144 (July 11, 2022), thereby terminating the investigation, *see* 19 U.S.C. § 1673d(c)(2).  On August 3, 2022, Commerce issued an order finding that the "antidumping duty investigation of freight rail couplers from China has been terminated" and directing Customs and Border Protection ("CBP") to liquidate entries of FRCs.  *Liquidation Instructions—Termination*, Bar Code

**PUBLIC VERSION**

4271905-01, Inv. No. A-570-143;[2] *see* 19 U.S.C. § 1673d(c)(2)(A).  Petitioner had until August 10, 2022, to seek judicial review of the Commission's negative determination. *See* 19 U.S.C. § 1516a(a)(1)(D).

Rather than seek judicial review, however, Petitioner filed a second petition on September 28, 2022, seeking to impose antidumping duties on FRCs from China ("*FRC II*").  The Petition in *FRC II* narrowed the proposed scope from all four FRC components—knuckles, coupler bodies, yokes, and follower blocks—to only the first two components, knuckles and coupler bodies.  Appx2451–2452, Appx2464 n.34.  The Petition also sought to impose antidumping duties on FRCs from Mexico.  Appx2451, Appx2473–2476.  The allegations against China were virtually identical to those in *FRC I*—underselling by Chinese producers was causing U.S. producers to lose market share.  Appx2481, Appx2484–2485.  The Petition asked the ITC to cumulate imports from China and Mexico in its material injury analysis.  Appx2473–2476.  The Petition noted that "the current petition involves a modified scope" from the *FRC I* investigation "and the addition of Mexico as a subject country."  Appx2452.  The Petition did not offer any good cause for why Commerce should start a new investigation into FRCs from China within two years of the ITC's negative material injury determination in *FRC I*.

As in the first investigation, the Petition identified two channels of distribution

---

[2] "{T}his Court must take judicial notice of decisions of federal executive departments when requested by a party," including determinations "by Commerce." *Win-Tex Prod., Inc. v. United States*, 17 CIT 786, 788, 829 F. Supp. 1349, 1352 (1993) (emphasis omitted).

for FRCs.  One is the replacement market, in which railcar owners and maintenance companies purchase FRCs to replace broken or worn FRCs on railcars already in service.  Appx2475–2476.  The other is the Original Equipment Manufacturer ("OEM") channel, in which new railcar builders purchase FRCs (along with innumerable other railcar components) for incorporation into new railcars.  *Id.*  The OEMs then sell finished railcars to third parties, such as Class I railroads (*e.g.*, Union Pacific, BNSF, or CSX) and leasing companies (like TTX).  Appx1396, Appx1456 n.21, Appx2455.

Because of the Petition's timing, there was substantial overlap in the ITC's Period of Investigation ("POI") for each of the two investigations: *FRC I* covered imports from 2019 to 2021, Appx1396, while *FRC II* covered imports from 2020 to 2022, ITC, *Certain Freight Rail Couplers and Parts Thereof from China*, Pub. No. 5438, at 16 (July 2023).[3]  Petitioner anticipated this overlap.  *See* Appx2460 (expecting the ITC's POI to cover 2019 through the first half of 2022).  So too did Commerce.  *See* Appx3227 (assessing the sufficiency of Petitioner's injury allegations based on imports from 2019 through June 2022).

Commerce initiated the investigation into imports from China, finding that the Petition sufficiently made out a claim for imposing antidumping duties.  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Initiation of Less-Than-Fair-Value Investigations*, 87 Fed. Reg. 64,444,

---

[3] *See supra* note 2.

64,450 (Oct. 25, 2022) ("*Initiation Notice*"), Appx2973; Appx3210–3211.  In particular, in its *Initiation Checklist* and accompanying Attachment III, it concluded that Petitioner had sufficiently alleged material injury and causation.  Appx3206, Appx3223–3229.  Commerce's analysis did not discuss the *FRC I* decision or whether Petitioner had good cause to seek review of it within two years of its issuance.  *See id.*  Wabtec and other Respondents were not permitted to comment on the Petition's sufficiency prior to Commerce's decision to initiate the investigation.  *See* 19 U.S.C. § 1673a(b)(3)(B).

Because the Petition in *FRC II* covered the same subject matter from the same country over a nearly identical POI as *FRC I*, Wabtec urged Commerce to terminate the investigation.  Appx6396–6399.  Wabtec contended that termination was required by Section 751(b)(4) of the Tariff Act, which provides that Commerce and the Commission "may not review a {final} determination"—affirmative or negative—in a countervailing duty or antidumping investigation absent "good cause."  19 U.S.C. § 1675(b)(4); *see* Appx6397.  And because *FRC II* would necessarily entail a "review" of determinations in *FRC I*, and Petitioner never claimed it had "good cause," this provision required termination of *FRC II*.  Appx6397.  Wabtec also argued that Commerce had inherent authority to terminate the investigation in order to protect the integrity of prior administrative proceedings.  Appx6397–6399.[4]

---

[4] Wabtec raised the same issue before the ITC, which concluded that it was powerless to terminate its own investigation "once Commerce initiates an investigation."  Appx6399.

Commerce took no issue with Petitioner's effort to relitigate the results of *FRC I*, finding in the IDM for its final less-than-fair-value determination, that initiation was proper and that it lacked authority to terminate the investigation.  Appx6724–6725.  According to Commerce, the Petition met the requirements of Section 732(b) of the Tariff Act, which provides that an investigation "shall be initiated whenever an interested party … files a petition with the administering authority" that alleges the elements necessary for the imposition of antidumping duties and contains reasonably available information supporting those allegations.   19 U.S.C. § 1673a(b)(1); *see* Appx6724.  And Commerce found that Section 751(b) did not apply because that provision was limited to "changed circumstances review{s}."  Appx6725. In Commerce's view, *FRC II* was "not a changed circumstances review" but rather "a separate investigation."  *Id.*  Commerce also found that, regardless of Section 751(b), it had "no authority to terminate the investigation" once initiated under section 732(b).  *Id.*

## B.    Commerce Includes Within Scope FRCs Already Attached to Railcars.

In addition to the initiation issue, the parties also disputed whether FRCs that enter the United States already attached to railcars should be included within the scope of the investigation.  This issue was significant to the parties because domestic and Chinese FRCs compete head-to-head for sales to new railcar builders in Mexico, where a growing portion of railcars that enter the United States are manufactured.[5]

---

[5] As relevant to this issue, the focus in the underlying investigation was FRCs

**PUBLIC VERSION**

Appx2472, Appx2493–2494, Appx3800.  Thus, if the scope included FRCs attached to the finished railcars that are imported into the United States from Mexico, then the domestic industry could effectively expand the reach of U.S. antidumping laws to address not only competition for FRC sales made in the United States, but competition for FRC sales to new railcar builders in Mexico as well.

Respondents raised two principal objections to Commerce's preliminary decision to include attached FRCs within scope, with both implicating the statutory reach of the antidumping laws.  *First*, Respondents argued that including FRCs attached to railcars in Mexico and then imported into the United States was improper because, as a matter of law, Petitioner's theory of injury was not cognizable under the Tariff Act.  Appx6337.  To the extent Petitioner's theory rested on the claim that the domestic industry was being injured by lost sales to new railcar builders in Mexico, that theory of injury was not redressable under the Tariff Act, but subject to a different statutory remedial scheme administered by the United States Trade Representative.  Appx3359, Appx6337.  Respondents argued that including attached FRCs thus exceeded Commerce's statutory authority under the Tariff Act.  Appx6337.

*Second*, the inclusion of attached FRCs also violated the antidumping statute because the statute allows Commerce to impose duties on only a single "*class or kind of foreign merchandise.*"  Appx6373 (quoting 19 U.S.C. § 1673(1)).  Respondents

---

attached to railcars *in Mexico*.  However, the scope covers FRCs attached to railcars in any third country.  Although Wabtec challenges the inclusion of FRCs attached to railcars in any third country, for ease of reference, our brief focuses on Mexico.

**PUBLIC VERSION**

argued that, in defining the scope of the investigation, the relevant question is whether FRCs and railcars are two distinct classes or kinds of merchandise. *Id.* But rather than address that question, Commerce framed the initial question as whether FRCs themselves are substantially transformed into a distinct class or kind of merchandise when attached to a railcar. *Id.* This approach, Respondents argued, erred by "characterizing what comes over the border as two distinct products—an FRC and a railcar." Appx6374 n.9. In reality, what comes across the border is a single product—"a *working freight train*." *Id.*; *see also* Appx3717. Accordingly, an order on FRCs (one class or kind of merchandise) could not also include freight railcars (a separate class or kind of merchandise). To conclude otherwise would upend longstanding principles of antidumping law and allow orders on components to apply to any downstream products as well (*e.g.*, roller bearings in imported automobiles, steel nails in imported carpentry products, etc.). Appx6374–6375.

In its *Final Scope Memorandum*, Commerce refused to exclude attached FRCs from the scope. Appx6554–6558. Commerce found that it was powerless to assess the legal sufficiency of Petitioner's theory of injury because "the question of injury to the domestic freight rail coupler industry … is within the purview of the ITC, which is conducting the concurrent injury investigation, a separate and distinct proceeding." Appx6558. Indeed, Commerce disclaimed responsibility for addressing *any* arguments on the topic. As Commerce put it, "Commerce does not determine whether subject imports are a source of injury to the U.S. industry." *Id.* Commerce also found that Respondents' argument about Petitioner's invalid theory of injury wrongly

PUBLIC VERSION

presumed that FRCs lose their distinct identity when joined to a freight railcar. *Id.*

Commerce also rejected Respondents' class-or-kind argument. Appx6554–6557. Commerce disagreed that the proper legal inquiry is "whether a freight rail coupler is a separate class or kind of merchandise from a freight railcar," because "the scope does not cover freight railcars." Appx6555. Thus, Commerce instead framed the initial question as whether FRCs become new articles of commerce when attached to railcars—and answered in the negative for two reasons. Appx6554–65557. First, FRCs "are not a permanent component of a railcar" because they "have a shorter useful life than freight railcars" and so need to be replaced from time to time. Appx6556. Second, FRCs do not undergo "physical changes when attached to … railcars." Appx 6555. When Respondents objected that this reasoning would "dramatically expand the AD/CVD laws" by allowing duties to be imposed on almost any "input into a finished downstream product," Commerce did not deny this consequence; it simply stated that it did not need to address "hypothetical scenarios" not presently before it. Appx6557. The scope in the *Final Determination* thus included attached FRCs, adopting the language Petitioner initially proposed. Appx6727.

## STANDARD OF REVIEW

The Court must hold unlawful any aspect of Commerce's decision-making that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "To fulfill that obligation, {courts} insist that Commerce 'examine the record and articulate a satisfactory

PUBLIC VERSION

explanation for its action.'" *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).   Decisions premised on errors of statutory interpretation are not in accordance with law.  *Fag Kugelfischer Georg Schafer AG v. United States*, 332 F.3d 1370, 1372 (Fed. Cir. 2003).

## **ARGUMENT**

## I.   **COMMERCE UNLAWFULLY PERMITTED PETITIONER TO RELITIGATE THE FINAL DETERMINATIONS IN *FRC I*.**

Petitioners are not free to force an endless cycle of reinvestigation whenever they are displeased with a prior determination in an antidumping proceeding they themselves brought.  Yet, here, Petitioner attempted precisely that in launching *FRC II* just a few months after *FRC I* was terminated.  Indeed, Petitioner cited to nothing other than its strategic choice to repackage its existing allegations to bring a second petition on the heels of *FRC I*.  Nevertheless, Commerce initiated, and refused to terminate, the second investigation on the grounds that its hands were tied.  This was error.  First, Commerce misconstrued Section 751(b)(4) of the Tariff Act, which barred the second proceeding here.  Second, Commerce failed to acknowledge that it had inherent authority to terminate the investigation to preserve the integrity of the prior proceedings.  Either point alone requires remand of its decision.

PUBLIC VERSION

A.    **Section 751(b)(4) Required the Dismissal or Termination of *FRC II.***

    1.    **Commerce did not find good cause under Section 751(b)(4), which was required to initiate *FRC II.***

Section 751(b)(4) requires that a petitioner show "good cause" before seeking "review" of any final determination by Commerce or the ITC, if less than two years have elapsed.   19 U.S.C. § 1675(b)(4).   Yet, here, Petitioner did not offer—and Commerce did not find—"good cause."   Commerce thus erred in initiating, and refusing to terminate, this investigation.

    **a.**   Section 751, subsection (b), of the Tariff Act addresses review of previous final determinations.   *Id.* § 1675(b).   The subsection comprises four paragraphs. Paragraph (1) authorizes review of previous *affirmative* determinations that resulted in antidumping or countervailing duty orders based on changed circumstances. Paragraphs (2) and (3) lay out procedural rules for conducting the review authorized in paragraph (1).   By their terms, paragraphs (2) and (3) are limited to review "under this subsection" (*i.e.*, subsection (b)).   And paragraph (4) broadly provides that, "{i}n the absence of good cause," Commerce and the Commission "may not review" any final injury, less-than-fair-value, or countervailable-subsidy determination within 24 months of its publication.   *Id.* § 1675(b)(4)(A)–(B).

    Unlike paragraphs (2) and (3), however, paragraph (4) is not limited to review "under this subsection."   Rather, it applies to review of *any* "determination made under section 1671d(a) or 1673d(a)" (final Commerce determinations) and *any* "determination made under section 1671d(b) or 1673d(b)" (final ITC determinations).

14

*Id.* By their plain terms, these provisions thus include all final determinations, whether affirmative or negative. *See id.* As relevant here, this includes not only Commerce's own prior affirmative determination in *FRC I*, but the Commission's negative determination in *FRC I* as well. *See id.* § 1673d(b)(1) ("The Commission shall make a final determination of whether an industry in the United States is materially injured, or is threatened with material injury … by reason of {subject} imports …."). Indeed, by cross-referencing the final-determination provisions without any language limiting them to final *affirmative* determinations, paragraph (4) stands in stark contrast to paragraph (1), which is limited to "final *affirmative* determination{s}." *Id.* § 1675(b)(1)(A), (C) (emphasis added). It is a bedrock presumption of statutory interpretation that "differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017). As relevant here, that means that Petitioner, upon refiling a petition within 24 months of Commerce's and the ITC's previous determinations, had to demonstrate "good cause" to justify review of those determinations.

The Tariff Act's structure reinforces this conclusion. The Act establishes an exceptionally intricate remedial scheme of adjudicatory authority divided between two agencies, with each step of the process defined with great specificity and subject to deadlines of unusual brevity. At the conclusion of that process, it offers only one route for review as of right: a judicial action in this Court. 19 U.S.C. § 1516a(a)(1). The Act does not provide for rehearing, unlike many other agencies. And the Act emphasizes that the agencies' determinations are "final." *E.g.*, *id.* § 1673d(a)(1),

**PUBLIC VERSION**

(b)(1).  From this highly reticulated scheme, Congress has "prescribed the specific, complete and exclusive mode for … review of" the agencies' orders, such that review "must be made in the Court {of International Trade} or not at all."  *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958).  Section 751(b)(4) makes that inference explicit by directly forbidding review of any final determination (whether affirmative or negative) within two years absent a showing of "good cause."

    **b.**  For these reasons, Petitioner was required to establish—and Commerce was required to find—"good cause" to initiate and conduct the investigation in *FRC II*.  Indeed, Petitioner could demonstrate injury only by reexamining—and upsetting—the ITC's final negative determination and subsidiary findings in *FRC I*, whose scope covered all the products at issue in *FRC II* and for a substantially overlapping POI (2019–2021 and 2020–2022, respectively).[6]  Yet, Commerce did not find any "good cause" necessary to justify the reviews entailed by *FRC II*.  As a result, Commerce erred in initiating, and later failing to terminate, the investigations in *FRC II*.

       **2.   Commerce's rationale for refusing to apply Section 751(b)(4) was flawed.**

    In refusing to terminate the investigation, Commerce did not dispute that Petitioner failed to establish good cause or that the investigations in *FRC II* would entail a "review" of determinations in *FRC I*.  Instead, the sole basis for Commerce's

---

    [6] In addition, the Petition also asked Commerce to review its less-than-fair-value determination from *FRC I* by considering again whether FRCs from China are sold at less than fair value.

refusal to terminate the investigation was the flawed assumption that Section 751(b) applied only to "a changed circumstances review," *i.e.*, the procedure outlined in Section 751(b)(1) for obtaining review of a prior *affirmative* final determination based on "changed circumstances." Appx6725.  Commerce rested this interpretation solely on the subsection title ("Reviews Based On Changed Circumstances").  *Id.* And because the Petition in *FRC II* did not seek review under Section 751(b)(1), Commerce concluded that there was no need to find good cause before initiating and conducting the investigation.  *Id.*

Commerce's position is untenable, however, because it relies solely on a misreading of subsection (b)'s title.  Although Commerce itself may treat the phrase "changed circumstances review" as a term of art, the *Tariff Act* nowhere specifies that this phrase refers *only* to review of final affirmative determinations under Section 751(b)(1).  Indeed, since "changed circumstances" are the paradigmatic example of "good cause," *United States v. Morales*, 807 F.3d 717, 723–24 (5th Cir. 2015), collateral review of a recent prior determination pursuant to a showing of good cause plainly qualifies as a "review based on changed circumstances."  *See Wall v. Kholi*, 562 U.S. 545, 553 (2011) (in a legal context, "review" means "a judicial … reexamination of a judgment or claim").

Moreover, even if Commerce were right about the meaning of subsection (b)'s title, it was still error to rely on it over—and without even considering—the operative text of Section 751(b)(4).  Although statutory "titles" are "permissible indicators of meaning," they "should never be allowed to override the plain words of

PUBLIC VERSION

a text." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 221–22 (2012); *see also Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947) ("titles are not meant to take the place of the detailed provisions of the text"). Here, the plain words of the text are clear. The marked reference in paragraph (4) to *any* "determination made under section 1671d(a) or 1673d(a)" and *any* "determination made under section 1671d(b) or 1673d(b)" unambiguously bars review of all final determinations—whether affirmative or negative—absent good cause. *Supra* at 14–15. The subsection title cannot create ambiguity where none exists in the operative text.

Commerce further stated that, compared to *FRC I*, *FRC II* "cover{s} a different POI and a different mix of merchandise from both China and Mexico." Appx6725. Commerce never explained why these observations were relevant, much less made them an independent ground for its decision. But in any event, they do not disprove that the Petition in *FRC II* sought "review" of the ITC's negative injury determination in *FRC I*. Although not exactly identical, the POIs overlapped to such an extent that it was necessary to rely on imports covered by *FRC I* to make an affirmative injury finding in *FRC II*. *See, e.g.*, Appx3227 (deeming Petitioner's allegations of causation sufficient based on imports from "2019, through June 2022"). Similarly, all subject merchandise in *FRC II* was subject merchandise in *FRC I*. *Supra* at 6. And even with cumulation by the ITC, Commerce and the ITC still conducted distinct investigations of Chinese and Mexican imports and made

distinct final determinations for each, issued months apart.[7]  Thus, the only way to find injury in *FRC II* was to find injurious imports ruled non-injurious in *FRC I*.

Commerce also assumed its hands were tied by the general statutory obligation to initiate an investigation when a petition alleges the statutory elements for duties and provides reasonably available information to support those allegations. Appx6724–6725 (quoting 19 U.S.C. § 1673a(b)(1)).  But because Section 751(b)(4)'s bar on review applies to *FRC I*, the Petition could not lawfully "allege{}" the "element{}" of injury without seeking the precise "review" forbidden by Section 751(b)(4).  19 U.S.C. § 1673a(b)(1).  Commerce thus had not only the authority, but the *duty*, to "dismiss the petition" rather than initiate an investigation.  *Id.* § 1673a(c)(3).  Commerce's initiation decision and its refusal to terminate the investigation must be remanded.

### B.  Commerce Had Authority to Terminate the Investigation.

Commerce separately erred in concluding that it had "no authority to terminate the investigation" once initiated.  Appx6725.  If that were the rule, Commerce would be "obligate{d} … to continue … in the knowledge that there existed a defect in the proceedings which could result in reversal" on judicial review. *Gilmore Steel Corp. v. United States*, 7 CIT 219, 223, 585 F. Supp. 670, 674 (1984);

---

[7] *See Final Determination*, Appx6726; *Certain Freight Rail Couplers and Parts Thereof from China*, 88 Fed. Reg. 43,398 (July 7, 2023); *Certain Freight Rail Couplers and Parts Thereof From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 88 Fed. Reg. 65,153 (Sept. 21, 2023); *Certain Freight Rail Couplers and Parts Thereof from Mexico*, 88 Fed. Reg. 77,612 (Nov. 13, 2023).

*see Tung Fong Indus. Co. v. United States*, 29 CIT 346, 350, 366 F. Supp. 2d 1308, 1311 (2005); *Kokusai Elec. Co. v. United States*, 10 CIT 166, 172, 632 F. Supp. 23, 28 (1986); *Blaw Knox Const. Equip. Co. v. United States*, 8 CIT 210, 212, 596 F. Supp. 476, 478 (1984). That cannot be right. Once apprised of the statutory bar in section 751(b)(4), Commerce had the right and duty to terminate the investigation.[8]

In addition to its statutory authority to terminate the investigation, Commerce also had the inherent authority in administering the Tariff Act to guarantee the integrity and finality of previous antidumping determinations. Commerce's failure to even acknowledge—much less exercise—this inherent authority was error.

All administrative agencies, including Commerce, have the inherent power to regulate and maintain the integrity of their own proceedings. *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008). For instance, Commerce can reopen its proceedings to address fraud, despite having no explicit statutory basis for that authority. *Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1381 (Fed. Cir. 2011); *Chemours Co. FC LLC v. United States*, 393 F. Supp. 3d 1186, 1194 (CIT 2019); *Elkem Metals Co. v. United States*, 26 CIT 234, 240, 193 F. Supp. 2d 1314, 1321 (2002).

Commerce's inherent power naturally extends to guaranteeing the finality of decisions when they are attacked or manipulated. Finality is not just a matter of

---

[8] Even if Commerce could not have terminated the investigation, Commerce's decision to initiate the investigation was unlawful under Section 751(b)(4), and that decision, having merged with Commerce's final determination, is reviewable now. *Gilmore*, 7 CIT at 223, 585 F. Supp. at 674.

convenience; it goes to the heart of an agency's power to *authoritatively* resolve the questions within its jurisdiction. If administrative tribunals did not have some mechanism to guarantee the conclusiveness of their earlier decisions in later actions, their "aid would not be invoked for the vindication of rights of person and property." *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 336–37 (2005) (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 49 (1897)). Thus, as a necessary corollary to its power to conduct and resolve an antidumping investigation, Commerce has the power to demand that losing parties present a valid justification before effectively reviving a prior investigation. *See* 19 U.S.C. § 1673d(a)(1), (b)(1); *City of Tacoma*, 357 U.S. at 336–37 (bar on collateral review of agency determination followed from the congressional directive "that its judgment 'shall be final,'" without any "need" to "be labeled res judicata, estoppel, collateral estoppel, waiver or the like either by Congress or the courts"). Here, this means that Petitioner cannot compel Commerce to initiate and conduct a reinvestigation by Commerce and the Commission of FRCs from China as though the termination of *FRC I* and the Commission's final negative injury determination had never occurred. Because Petitioner never even tried to justify its repeat petition, Commerce had the inherent authority to terminate the investigation, which Wabtec squarely invited Commerce to exercise. Appx6397–6399. Commerce nevertheless ignored its inherent authority altogether. Remand is therefore necessary so that Commerce can address in the first instance how to exercise its discretion.

PUBLIC VERSION

## II. COMMERCE ERRED IN REFUSING TO EXCLUDE FRCS ATTACHED TO RAILCARS FROM THE SCOPE.

For the foregoing reasons, Commerce should never have allowed this investigation to proceed.  But, once it did, Commerce compounded its error by including within the scope FRCs attached to railcars abroad and imported into the United States as a component part of a railcar.  This was improper for three independent reasons.  First, even accepting Petitioner's factual allegations as true, its theory of injury that drove the inclusion of attached FRCs within the scope is not *cognizable*—and thus not redressable—under the Tariff Act.  Second, the inclusion of attached FRCs violates the principle that antidumping orders must be limited to a single class or kind of merchandise.  Attached FRCs enter the country as part of a railcar, and railcars are not the same class or kind of merchandise as FRCs.  Third, FRCs do not retain their identity as separate and distinct articles of commerce after they are incorporated into railcars.  Each of these errors requires remanding Commerce's scope determination.

### A. As a Matter of Law, Couplers Attached to Railcars Cannot Be Within Scope Because the Underlying Theory of Injury Is Not Cognizable in These Antidumping Proceedings.

#### 1. Section 731 does not address lost sales in third countries, as the inclusion of attached FRCs within the scope was designed to do.

Petitioner proposed, and Commerce ultimately adopted, scope language that includes FRCs that enter the country already "mounted" on or "joined with … a completed railcar."  Appx2452.  This formulation was designed to address a unique theory of injury advanced by Petitioner—namely, to address head-to-head

22

competition between U.S. and Chinese FRCs for sales to new railcar builders in Mexico.  In particular, the inclusion of attached FRCs attempts to address the scenario where FRCs are imported directly from China into Mexico, win the sale to new railcar builders in Mexico, and are incorporated into Mexican-made railcars that eventually enter the United States.  Appx2471–2472, Appx3359–3360, Appx3800.[9] Petitioner explained that Chinese FRCs had been able to avoid section 301 duties by being imported into Mexico and incorporated into new railcars there, as opposed to the FRCs being imported directly into the United States.  Appx2472.  The proposed scope would prevent this scenario by applying antidumping duties to the FRC when the new railcar itself enters the United States from Mexico.  Appx3800.

But even taking all of Petitioner's factual allegations as true, they do not state a viable theory of injury.  Instead, they show only that the FRCs attached to railcars in Mexico could harm the domestic industry by depriving the domestic industry of sales to customers in Mexico (*i.e.*, *export* sales), which Commerce itself recognized are not cognizable injuries in these proceedings.  *See* Appx2561 (instructing Petitioner to "remove U.S. export shipments from the calculation of total U.S. market … and revise your market share analysis in Exhibit I-15 accordingly").  And precisely because such injuries are not cognizable in these proceedings, they should not have been within the scope.

---

[9] In Exhibit I-15 of the Petition, Petitioner included [                                    ] in its calculation of the domestic industry's "Market Share," a further indication of its theory of injury.  Appx80124.

**PUBLIC VERSION**

The scope of an antidumping investigation must be limited to circumstances where a domestic industry has been materially injured "by reason of *imports*" of subject merchandise.   19 U.S.C. § 1673(2) (emphasis added); Appx3358–3359, Appx6337.  The phrase "'by reason of'" in this provision "requires, at the least, but-for causation." *Changzhou Trina Solar Energy Co. v. ITC*, 879 F.3d 1377, 1382 (Fed. Cir. 2018).  Thus, antidumping duties are permitted only where, but for "imports of" the subject  merchandise, the domestic injury would have avoided injury.  *See also* Appx3358 (quoting *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,323 (May 19, 1997) ("*Preamble*") (noting that scope should focus on "those products causing injury to the domestic industry")).  By the same token, antidumping duties are not permitted where there are no "imports" into the United States at the time of injury, which is the case where lost sales to new railcar builders in Mexico are at issue.   Indeed, where the domestic industry loses such a sale, the injury to the domestic industry is the same whether or not the merchandise that won the sale later enters the United States (i.e., whether or not there is an *import* of anything).

An example illustrates the point.  If China dumped FRCs into Mexico, and as a result domestic FRC producers lose revenue because they lose sales to new railcar builders *in Mexico*, the domestic industry may be harmed by reason of the goods dumped into Mexico, but not "by reason of *imports* of" the dumped goods into the United States.  19 U.S.C. § 1673(2) (emphasis added).  After all, the injury is complete at the time of the lost sale in Mexico, making it irrelevant whether the FRCs happen to enter the United States later on a new railcar.  Appx3359.  Thus, such FRCs remain

24

outside the reach of the statute, precisely because any injury suffered by the domestic industry is not caused by *importation* of such FRCs into the United States, but by the lost FRC sales in Mexico, which occurred before there was *any* importation at all. Appx3359.

The existence of a nearby statute explicitly addressed to "third-country dumping," 19 U.S.C. § 1677k, reinforces the point. Appx3359. Section 1677k allows a domestic industry to file a petition if "merchandise produced by a foreign country … is being dumped in {a third} country" and "such domestic industry is being materially injured … by reason of such dumping." 19 U.S.C. § 1677k(b)(1). A petition under section 1677k must be filed with the United States Trade Representative—an officer responsible for coordinating "discussions and negotiations with foreign countries" on trade, *id*. § 2541(b)—not Commerce. *Id*. § 1677k(b)(1). If the Trade Representative finds a reasonable basis for the petition, she will not take action against the dumping country directly; rather, in accordance with U.S. treaty obligations, she will "submit … an application" to the "appropriate authority" of the third country to initiate an "antidumping action" under its own law. *Id*. § 1677k(c)(1). In other words, this scheme contemplates a more limited, diplomacy-based approach, which reflects the unique foreign policy concerns present in responding to third-country dumping.

This scheme is totally at odds with including within the scope of *these proceedings* FRCs attached to railcars in Mexico. Appx3695–3696. It allows Petitioner to target third-country dumping under the Tariff Act in circumvention of

the reticulated remedial scheme in Section 1677k. Indeed, the whole point of including attached FRCs was to address third-country dumping. Petitioner originally insisted on including attached FRCs precisely because "U.S. and Chinese FRC producers compete head-to-head for sales to rail car producers" in Mexico, and "{l}ost sales to Chinese FRCs and FRC components mounted abroad and then imported into the United States injures the domestic industry." Appx3800; *see also* Appx80124 (cataloguing the [      ] in "[                    ]" over the POI). But courts do not lightly assume Congress meant to allow litigants to sidestep "its careful and thorough remedial scheme{s}" through "artful pleading." *Brown v. GSA*, 425 U.S. 820, 833 (1976). That is all the more true here, where circumvention of Section 1677k's limits would enable private litigants in proceedings under the Tariff Act to insert administrative adjudicators and courts into "foreign relations," an area "traditionally" not considered to be within their "institutional capacity." *Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020). That result is evident in this very case: The Government of Mexico participated in Commerce's investigation to express that it was "manifestly alarmed" at the use of U.S. antidumping laws to cover FRCs attached to railcars in Mexico. Appx6532. While the text of the Tariff Act alone precludes this result, the foreign-policy implications only underscore and reaffirm the important limits of these proceedings.

> **2.     Commerce improperly disclaimed authority to enforce the limits of the Tariff Act through a scope determination.**

Commerce never disputed that Tariff Act proceedings are not designed to address injuries arising from third-country dumping or lost sales abroad. On the

contrary, Commerce itself attempted to police this line by directing Petitioner, before initiation, to "remove U.S. export shipments from the calculation of total U.S. market." Appx2561. But Commerce failed to recognize that that same principle had implications for defining the scope of the investigation. In particular, despite having directed Petitioner to exclude U.S. export shipments from market-share calculations, Commerce disclaimed any responsibility for assessing Petitioner's theory of injury when defining scope. Appx6558. But that position is inconsistent with its own prior direction to Petitioner, which is reason enough to remand Commerce's decision. *See NSK Ltd. v. United States*, 390 F.3d 1352, 1357 (Fed. Cir. 2004) (agencies cannot adopt "internally inconsistent" positions in the course of the same proceeding). It is also at odds with its statutory role in these proceedings.

To begin with, it is Commerce's duty to define the scope of an antidumping investigation, and any resulting duty orders at the end of an investigation. *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002); *see also King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012) (whatever "petitioners and other interested parties … may propose," ultimately "Commerce alone defines the scope of the AD {investigation and} order."); Appx3358. In defining scope, Commerce has significant discretion. *M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2022). But the exercise of that discretion must comport with the letter and "purpose of the Tariff Act and the violation found"—or not found. *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019). Accordingly, Commerce may "depart from the scope as proposed by a petition if it determines that petition to be

**PUBLIC VERSION**

overly broad … or in any other way defective." *M S Int'l*, 32 F.4th at 1151 (cleaned up).   Commerce itself has suggested that one way a proposed scope is defective is when it covers products that do not cause a cognizable injury.   Appx3358–3359; *see also Preamble*, 62 Fed. Reg. at 27,323.   As explained above, third-country dumping and lost sales to Mexico are not cognizable theories of injury under the Tariff Act, which means Commerce had a duty to conform the scope of the investigation accordingly.

Contrary to Commerce's assertion, Appx6558, this was not an issue entrusted to the ITC.   As the agency responsible for defining scope, Commerce had an obligation to ensure a fit between cognizable theories of injury alleged by Petitioner and the scope.   This is evident from the text and structure of the Tariff Act.   Before initiating an investigation, Commerce must "determine whether the petition alleges the elements necessary for the imposition of a duty under section 1673 of this title and contains information reasonably available to the petitioner supporting the allegations."   19 U.S.C. § 1673a(c)(1)(A)(i).   Those elements include, of course, whether the domestic industry was injured "by reason of imports of that merchandise."   *Id.* § 1673(2).   Commerce's regulations acknowledge this duty, requiring petitioners to include "{f}actual information regarding material injury … and causation."   19 C.F.R. § 351.202(b)(10).   And Commerce recognized this duty during initiation in this investigation: Attachment III to its *Initiation Checklist* analyzed Petitioner's allegations of injury and causation and found them sufficient.   Appx3223–3229.   Petitioner too agreed that "Commerce {} undertakes an injury

analysis in determining whether to initiate an investigation." Appx6471. It is thus clear that Commerce must engage with a petitioner's injury theory, which necessarily entails a legal interpretation of that statutory element. And where the allegations in a petition do not demonstrate a theory of injury that is *cognizable* under the Tariff Act, Commerce must not initiate the investigation—or, as in this case, must not define the scope to encompass non-cognizable theories of injury. Appx3359.

Commerce has also recognized it has a continuing duty to tailor the scope to the petitioner's theory of injury after initiation. In the *Preamble* to its antidumping and countervailing duty regulations, Commerce acknowledged that a petitioner's proposed scope can be "over inclusive" and that Commerce accordingly must act to "focus the scope on those products *causing injury* to the domestic industry." 62 Fed. Reg. at 27,323 (emphasis added). To that end, the *Preamble* established Commerce's practice of "set{ting} aside a specific period early in an investigation for issues regarding product coverage to be raised" by "U.S. purchasers." *Id.* And in this very investigation, Commerce explicitly committed to allowing "interested parties to raise issues regarding product coverage" "{a}s discussed in the *Preamble* to Commerce's regulations." Appx2968 (citing *Preamble*, 62 Fed. Reg. at 27,323). In line with its obligations to "follow its own regulations," *Oy v. United States*, 61 F.3d 866, 875 (Fed. Cir. 1995), and avoid "internally inconsistent" positions, *NSK*, 390 F.3d at 1357, Commerce had to consider Wabtec's arguments that the proposed scope was broader than Petitioner's cognizable theories of injury.

Nothing in Commerce's gatekeeping role encroaches upon responsibilities

"within the purview of the ITC," as Commerce suggested.  Appx6558.  The ITC is a factfinder.  It takes the scope as a given and determines whether imports of merchandise described within the scope cause or threaten material injury—a quintessentially factual determination.  *See, e.g.*, *Certain Freight Rail Couplers and Parts Thereof from China*, Pub. No. 5438, *supra*, at 7–8 (taking as given the scope "Commerce has defined").  The ITC does not evaluate or second-guess the legal theory embodied in the scope language.  As explained, allowing a particular legal theory to proceed is entrusted by statute to Commerce, which is charged with determining "whether the petition alleges the elements necessary for the imposition of a duty under {Section 731}."  19 U.S.C. § 1673a(c)(1)(A)(i).

In this respect, Commerce's role is analogous to a district court's role in ordinary litigation—it decides the legal issues (including whether a plaintiff has stated a claim), while leaving the factfinding to the jury.  And the ITC's role is akin to the jury's, which finds the facts but takes the legal determinations as given.  *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 n.2 (Fed. Cir. 1992) ("Although both Commerce and the ITC are 'charged' with administering different parts of the Act, it is Commerce who determines that a petition is sufficient to cause the initiation of investigations—that the statutory requirements are satisfied.  The ITC's position … is that it defers to Commerce's initial determination, and that only Commerce can review that determination.").  And just as judges' role in civil cases is to weed out claims that do not involve a triable issue of fact, so Commerce can revise the scope to ensure it addresses only legally

PUBLIC VERSION

cognizable theories of injury.[10]  That function does not supplant the ITC's factfinding role, but makes sure that, when the ITC's investigation takes place, the focus of that proceeding is on the fact issues uniquely within its province and on theories of injury falling within the parameters of the Tariff Act.

Thus, contrary to Commerce's suggestion, Respondents were not asking it to displace the ITC's role and "determine whether subject imports are a source of injury to the U.S. industry."  Appx6558.  Instead, Commerce's job was to determine whether the theory of injury alleged by Petitioner—even if true as a factual matter—would be *legally cognizable* under the Tariff Act.  Appx3358–3360.  As explained, the relevant theory of injury alleged here—lost sales to OEMs in Mexico—is not cognizable under the Tariff Act.  Thus, Commerce had the authority and duty to tailor the scope to Petitioner's properly made allegations of injury.  *See M S Int'l*, 32 F.4th at 1151.

Nothing in this argument, moreover, depends on whether FRCs "lose their distinct identity when mounted or joined to freight railcars," as Commerce claimed.  Appx6558.  Even if Commerce were right that no substantial transformation occurs when an FRC is integrated into a new railcar, it remains the case that the importation of attached FRCs—which is to say, the importation of finished railcars—causes no

---

[10]  One important difference between motion-to-dismiss review under 12(b)(6) and Commerce's sufficiency review should not be lost sight of, however.  On 12(b)(6) review, the court must "assum{e} that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Commerce, by contrast, must find there is "information … supporting the allegations" in the petition.  19 U.S.C. § 1673a(c)(1)(A)(i).  In this respect, Commerce's review is more searching than a court's evaluation of a motion under Rule 12(b)(6).

injury to the domestic FRC industry.  Indeed, Petitioner's own theory of injury framed the relevant injury as lost "sales to rail car producers in Mexico."  Appx3800.  Whether or not the finished railcars themselves ever enter the United States is immaterial—any injury to the domestic industry occurred at the point of the lost FRC sale to railcar builders in Mexico.  If anything, the domestic industry should be pleased with the subsequent importation of railcars (regardless of who supplied the FRC), as it expands the replacement market by increasing the number of railcars that will eventually need new FRCs.  Appx3359.  In any case, regardless of how one conceptualizes an "attached FRC" for other purposes, the point of including attached FRCs within the scope was to address the head-to-head competition for sales to railcar builders in Mexico.  For these reasons, Commerce erred in relying on its substantial transformation analysis to address an argument about the *cognizability* of Petitioner's theory of injury.

In sum, Commerce gave no valid reason for fashioning the scope to remediate a theory of injury based on lost sales to railcar builders in Mexico.  This Court should remand with instructions to exclude attached FRCs.  At minimum, remand is needed because Commerce's analysis "failed to consider an important aspect of the problem"—namely, the differing theories of injury advanced by Petitioner to justify including imports of both attached and unattached FRCs within scope.  *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 872 (Fed. Cir. 2008).

### B.  Commerce Erred in Analyzing Attached FRCs Apart from Railcars.

In addition to the foregoing, there is a second, independent error in

Commerce's decision to include attached FRCs within the scope. To determine whether Commerce could include attached FRCs within the scope, the relevant question is whether an FRC is a separate class or kind of merchandise from a freight railcar. Appx6372–6373. But rather than answer that question—which is patently and undeniably yes—Commerce re-framed the initial inquiry as whether an *unattached* FRC is a separate class or kind of merchandise from an *attached* FRC. Appx6554. Commerce then applied a substantial transformation analysis to those two constructs—*i.e.*, unattached and attached FRCs—and concluded that both are the same class or kind of merchandise. Appx6555. For the reasons that follow, Commerce's reasoning and conclusion were contrary to law and unsupported by substantial evidence.

 **1.** It is fundamental that an antidumping duty order may cover only a single "class or kind of merchandise." 19 U.S.C. §§ 1673, 1673d(c)(1)(B)(ii), 1677(25); *see Torrington Co. v. United States*, 16 CIT 71, 74–75, 786 F. Supp. 1016, 1020 (1992); *Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Nov. 8, 2017), IDM cmt. 15 ("AD and CVD orders cover only one class or kind of merchandise"). So, for example, a single order could not include bicycles and refrigerators, any more than it could include FRCs and freight railcars. *See* Appx3706–3709 (explaining how FRCs and railcars are distinct classes and kinds of merchandise). Even Commerce seemed to agree. Commerce never mentioned, much less applied, its test for distinguishing between

classes and kinds of merchandise[11] to suggest that FRCs and freight railcars are the same class-or-kind of merchandise.

While that should have been the end of the matter, Commerce insisted that Petitioner's request to include "attached" FRCs somehow changed the rules. Rather than asking whether FRCs and railcars are different classes or kinds of merchandise, Commerce framed the relevant inquiry as whether an unattached FRC and an attached FRC are the same class or kind of merchandise, before concluding that they are because the former is "not substantially transformed" when "attached to a railcar." Appx6555. But Commerce erred by reversing the proper order of inquiry: Commerce *presumed* (wrongly) that "what comes over the border" are "two distinct products—an FRC and a railcar"—and then applied the substantial transformation analysis to the FRC alone to conclude that attached and unattached FRCs are the same class or kind of merchandise. Appx6374 n.9, Appx6496; *see also* Appx6374 ("Commerce's framing of the issues *presumes* (incorrectly) that the FRC retains its own identity after the FRC is assembled along with other essential parts … into a completed freight railcar."). This reasoning cannot stand.

---

[11] To distinguish classes and kinds of merchandise, Commerce applies the five *Diversified Products* factors: the "physical characteristics … of the product," the "expectations of the ultimate users," the "ultimate use of the product," the "channels of trade in which the product is sold," and the "manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2)(i)(A); *see Diversified Prods. Corp. v. United States*, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983); *Softwood Lumber from Canada*, 82 Fed. Reg. 51,806, IDM cmt. 15 (because "AD and CVD orders cover only one class or kind of merchandise," Commerce "conduct{s} an analysis under the *Diversified Products* criteria" when a product may be "a different class or kind of merchandise from the other products covered by the proposed scope").

PUBLIC VERSION

To start, the longstanding general rule, applicable to tariffs and antidumping orders alike, is that merchandise must be evaluated "in the condition in which it is imported." *Dell Prods. LP v. United States*, 642 F.3d 1055, 1058 (Fed. Cir. 2011) (quoting *Citroen*, 223 U.S. at 414–15); *see also Simod Am. Corp. v. United States*, 872 F.2d 1572, 1577 (Fed. Cir. 1989) (noting this "principle is so basic it hardly needs to be mentioned in any discussion of a classification problem by judges, officials, or lawyers having any serious involvement in such matters"); *MacLean Power, L.L.C. v. United States*, 359 F. Supp. 3d 1367, 1371 (CIT 2019) ("the duty to consider the merchandise in the condition in which it is imported applies to additional unfair trade duties."). Under this principle, when an import consists of multiple parts, it is evaluated *as a whole*; duties that cover "just *a part* of that merchandise" do not apply. *Pomeroy Collection, Ltd. v. United States*, 32 CIT 526, 549–50, 559 F. Supp. 2d 1374, 1397–98 (2008). For example, a completed "automobile" is not subject to duties applicable to "an automobile tire" imported on its own. *Rollerblade, Inc. v. United States*, 112 F.3d 481, 487 (Fed. Cir. 1997). Duties on glassware do not apply to lamps consisting of "glass vessels" *and* "candles." *Pomeroy Collection*, 32 CIT at 550 n.31, 559 F. Supp. 2d at 1398 n.31. Nor do duties on "washers" (think screws or bolts, not washing machines) cover "assembled products" containing washers. *MacLean Power*, 359 F. Supp. 3d at 1371.

Insofar as *attached* FRCs are concerned, the "article of commerce entering the United States" is a finished railcar. Appx6497; *see also* Appx6374 n.9 (explaining that "what comes across the Mexican border is a *working freight train*"). Petitioner

35

**PUBLIC VERSION**

itself acknowledged this in noting that attached FRCs are not subject to section 301 duties.  *See* Appx2472 (explaining that FRCs attached to railcars entering the United States "are not subject to section 301 duties, as they would be if the Chinese parts were imported directly into the United States").  This assertion is true precisely because attached FRCs enter the United States as a single product—*a finished railcar*—rather than enter separately as a railcar and an FRC.  Thus, the point of departure for a proper scope analysis is a finished railcar, as that is "the condition in which {an attached FRC} is imported."  *Dell Prods.*, 642 F.3d at 1058. And because it is undisputed that railcars are a distinct class or kind of merchandise from FRCs, the scope cannot extend to railcars without violating the principle (noted above) that an order can cover only a single class or kind of merchandise.

Commerce offered a single reason for concluding otherwise: Petitioner did not propose to cover railcars, but FRCs "mounted on a railcar." Appx6558.  But that will not do.  Petitioners cannot plead around bedrock principles of law.  As noted, petitioners are entitled to seek an order only on a single class or kind of merchandise; and the point of departure for this analysis is how the merchandise enters the United States.  Because an attached FRC physically enters the United States as a component of a railcar, Commerce must begin its analysis there to determine whether the scope can include both railcars and FRCs.  Petitioner cannot through artful pleading define away the facts on the ground, or the analysis those facts demand.  Appx3710 (urging Commerce to reject Petitioner's "clever work-around by including substantially transformed merchandise within the language of the scope").

PUBLIC VERSION

Stated differently, Petitioner cannot leverage proposed scope language to alter or pretermit the legal principles that govern scope analysis.  Appx3717.

Nevertheless, at Petitioner's insistence, Commerce elided the first analytical step by improperly "characterizing what comes over the border as two distinct products"—an FRC and a railcar—and used that framing as the starting point for its analysis.  Appx6374 n.9.  But just as an automobile is a unitary product, such that an order on tapered roller bearings would not apply to it, Appx3717, so Commerce "cannot reasonably characterize a working freight train as a collection of FRCs plus other freight car components."  Appx3718; *see also MacLean Power*, 359 F. Supp. 3d at 1371 (rejecting Commerce's determination that helical spring lock washers ("HSLWs") in MacLean's pole line hardware fell within scope of an antidumping order because the "HSLWs were neither imported alone nor as part of a set or kit, but rather as unique assembled products").  Indeed, Customs and Border Protection (CBP) confirmed that attached FRCs form a single article of commerce when entered on a railcar.  *See* Appx4874 (noting that if a *railcar* is entitled to exemption from entry under 19 C.F.R. § 141.4(b)(3) and (b)(4), that exemption "extends to the rail car's constituent components," including the FRC).  So did Petitioner.  *See* Appx2472 (explaining that FRCs attached to railcars entering the United States "are not subject to section 301 duties, as they would be if the Chinese parts were imported directly into the United States").  And Commerce never disagreed.

This does not mean that Commerce must always define the scope of an

antidumping order in accordance with how merchandise physically enters the United States.  While that is the starting point for analysis, it is not necessarily the end.  For example, if the merchandise physically entering the United States meets the parameters of Commerce's mixed-media test, the items crossing the border may be treated as distinct classes and kinds of merchandise, even if imported together, such that an antidumping order could cover one part of the imported merchandise but not another.  *See, e.g.*, *MacLean Power*, 359 F. Supp. 3d at 1371–73.  Yet, here, Commerce did not even invoke this test, much less apply it, in order to justify treating railcars and attached FRCs as distinct products coming across the border.[12]  Instead, Commerce simply *asserted* that attached FRCs and railcars are distinct products entering the United States.  Appx6558.  But such *ipse dixit* is no substitute for a reasoned analysis under governing principles of law, especially when Petitioner, Respondents, and CBP agreed (and Commerce never disputed) that attached FRCs and railcars enter the United States as a single article of commerce.

Nor can Commerce's substantial-transformation analysis of attached FRCs salvage its decision.  That is because the whole discussion rests on a false premise— that "attached FRCs" are the relevant unit of analysis.  By definition, an *attached* FRC enters attached to a railcar.  Thus, the railcar is the relevant comparator, such that the relevant question is whether railcars are a separate class or kind of merchandise from FRCs.  Because Commerce bungled this framing issue out of the

---

[12] Such an analysis would have been a dead-end in any event, because railcars "cannot perform their intended functions without {FRCs}."  *MacLean Power*, 359 F. Supp. 3d at 1373; *see* Appx2454, Appx3717–3718.

gate, all that followed—a factual comparison of attached and unattached FRCs—was beside the point.  Appx6496–6497 (explaining that "{o}nce a freight rail car has been produced, its constituent components, including FRC, lose their privilege to the substantial transformation evaluation because it is no longer a standalone item, it is a component of a new article of commerce entering the United {S}tates which is a freight rail car").

An example illustrates the point.  Commerce found no substantial transformation because FRCs "are not permanently affixed to railcars and do not undergo further processing or physical changes when attached to or removed from railcars." Appx6556.  Those are precisely the findings Commerce made in *MacLean Power*, which considered whether an order on washers applied to washers integrated into imports of pole line hardware.  *See* 359 F. Supp. 3d at 1373 (Commerce found that the washers at issue were "unmodified" physically and "easy to separate" from the pole line hardware).  Yet this Court concluded that those findings were inadequate to justify applying the antidumping order to those washers.  *See id.*  And, critically, in reaching this holding, this Court never mentioned or relied upon the substantial-transformation test.

Finally, deference to Petitioner's intent cannot justify Commerce's decision either.  Although Commerce generally tends to defer to a petitioner's proposed scope, ultimately "it is the responsibility of Commerce to determine the proper scope of the investigation and of the antidumping order, not of the complainant before Commerce." *Duferco*, 296 F.3d at 1097 n.15; *see also Torrington Co. v. United States*,

14 CIT 507, 512, 745 F. Supp. 718, 722 (1990) ("Commerce possesses the authority to subdivide the class or kind description submitted by petitioners in the petition, if ITA discovers that more than one class or kind of merchandise has been merged into a single class or kind."), *aff'd*, 938 F.2d 1276 (Fed. Cir. 1991).   Like any agency, Commerce is "a creature of statute that has no greater authority than that conferred under the governing statute." *Houston Oil & Ref., Inc. v. FERC*, 95 F.3d 1126, 1136 (Fed. Cir. 1996).   Where Congress has not authorized Commerce to impose antidumping duties on a product, the will of a private petitioner cannot give it the power to do so.   As relevant here, deference to Petitioner would upend the well-established proposition that "AD and CVD orders cover only one class or kind of merchandise," *Softwood Lumber from Canada*, 82 Fed. Reg. 51,806, IDM cmt. 15, a principle deriving from the text of the statute itself, *see* 19 U.S.C. §§ 1673, 1673d(c)(1)(B)(ii), 1677(25).   In fact, this Court recently raised, *sua sponte*, "statutory authority" concerns in the face of similar scope language.   *See Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1295 (CIT 2023) (noting that where Commerce imposes "duties only upon an ingredient in the imported merchandise, not the merchandise itself that was imported or sold for importation, it can be argued that Commerce lacked statutory authority" for its action).

\*   \*   \*

The only reasonable determination Commerce could have reached is that attached FRCs should be removed from the scope because completed railcars are not the same class or kind of merchandise as FRCs.   Its contrary determination must be

remanded.

**C.      Commerce Unlawfully Found No Substantial Transformation.**

Even if Commerce had properly framed the issue as whether FRCs undergo a substantial transformation when they are attached to railcars, it should have found that they do, because they are transformed into an integral part of a complete railcar.  In finding otherwise, Commerce failed to apply the proper legal standard, relied on flawed rationales, and reached findings unsupported by substantial evidence.

**1.      Commerce failed to apply the proper legal standard.**

Commerce failed to articulate, much less apply, the legal standard for determining whether a substantial transformation has occurred.  Because Commerce "misconceived the law," its determination "may not stand."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

"A substantial transformation occurs where, as a result of manufacturing or processing steps, the product loses its identity and is transformed into a new product having a new name, character and use."  *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018) (cleaned up).  This includes when distinct "parts … together form a new article" of commerce.  *Uniden Am. Corp. v. United States*, 24 CIT 1191, 1195, 120 F. Supp. 2d 1091, 1095 (2000).  "To determine whether there has been a substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the

merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." *Bell Supply*, 888 F.3d at 1228–29.  In their scope briefing, Respondents analyzed each of these factors at length to show that FRCs are substantially transformed when attached to a railcar.  Appx3710–3716, Appx6372 n.4.

In its *Final Scope Memorandum*, Commerce never mentioned the governing five-factor *Bell Supply* test.  *See* Appx6555–6557.  Instead, it found no substantial transformation because FRCs (1) "are not permanently affixed to freight railcars" and (2) "do not undergo further processing or physical changes when attached to or removed from railcars."  Appx6555.  Even if Commerce's second reason could be said to relate to the second *Bell Supply* factor, Commerce did not discuss the other four factors.  Appx6555–6557.  Nor did it explain the legal relevance of FRCs not being "permanently affixed," which does not clearly bear on any of the five factors.  *Id.*  By failing to tie its analysis to the proper standard, Commerce legally erred and did not "articulate a satisfactory explanation for its action."  *CS Wind*, 832 F.3d at 1376.

## 2. Commerce's determination relied on flawed rationales and is unsupported by substantial evidence.

Even if Commerce had been free to disregard the *Bell Supply* factors, its determination of no substantial transformation was not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Both of Commerce's two rationales for its determination are unreasonable and unsupported by substantial evidence.  Thus, each one independently requires remand.

**a.** It was unreasonable for Commerce to rely on FRCs not being "permanently

affixed" to find no substantial transformation.   It is undisputed that FRCs *are* permanently affixed to railcars in the sense that, once attached, they "are not removed until they are worn and/or damaged and need to be repaired or replaced." Appx3486; *see* Appx6556.  Likewise, it is undisputed that FRCs are a permanent part of a railcar in that a railcar cannot function without them.   Appx2454. Nevertheless, Commerce found that FRCs "are not a permanent component of a railcar" because they "have a shorter useful life than freight railcars" and so need to be replaced from time to time.  Appx6556.

Given the undisputed evidence that FRCs serve out their useful life attached to the railcar, Commerce's claim of non-permanence is unsupported by substantial evidence.  And Commerce's rationale to get around this factual problem approaches the farcical.   Whether an individual component's useful life is shorter than the assembled product's has no bearing on whether that product is an essential or integrated part of the whole.   Consider the famous ship of Theseus from Greek philosophy.  The planks of a wooden ship are replaced one by one until none of the original planks remains. *See Ship of Theseus*, *Oxford Dictionary of Philosophy* (3d ed. 2016).   On Commerce's view, the completed and working ship would have *no* "permanent component{s}" and thus should be seen as no different from a heap of unassembled planks.  Appx6556.

As Respondents warned Commerce, a railcar is not so different from Theseus' ship.  "A freight rail car consists of hundreds of parts."  Appx6381.  "{E}very part … is replaceable except for the steel plates welded together into a frame."  Appx6378;

**PUBLIC VERSION**

*see* Appx6381–6382 (citing parts catalog).  Thus, under Commerce's standard, "there are virtually no 'permanent parts' of the rail car."  Appx6382; *see* Appx6378.

Nor are railcars unique in this regard.  Many products are made of largely replaceable parts, so Commerce's logic would allow the antidumping laws to encompass many integrated components of products long thought not to be separately dutiable, such as tires or "a brake pad" on an automobile.  Appx6378.  *But see, e.g.*, *Rollerblade,* 112 F.3d at 487 (an "automobile" may not be subject to duties applicable to "an automobile tire" imported on its own).

Commerce failed to adequately address these concerns.  Commerce may not ignore "an important aspect of the problem" before it.  *Mittal Steel*, 542 F.3d at 872.  Yet, here, Commerce never addressed Respondents' point that, under its logic, a railcar—along with many other assembled products—has virtually no parts.  Instead, it observed only that its "determination is focused on freight rail couplers, which is the product covered by the scope of these investigations."  Appx6556.  That is insufficient.  Commerce must treat like cases alike.  *Viraj Forgings, Ltd. v. United States*, 27 CIT 1472, 1480, 283 F. Supp. 2d 1335, 1342 (2003).  If the rule it adopts in this case would have absurd and overbroad consequences in future cases, that rule cannot be "a satisfactory explanation for its action" in this case.  *CS Wind*, 832 F.3d at 1376.

Commerce's response to the argument that its "analysis would dramatically expand the AD/CVD laws" was also inadequate.  Appx6557.  First, it attempted the same dodge—that it need not concern itself with the absurd consequences of its rule

in future cases because those are "hypothetical scenarios." *Id.* Then, it noted other "orders covering subject merchandise imported together with or commingled with non-subject merchandise." *Id.*; *see* Appx6554–6555 n.49 (citing examples). But Respondents' claim is not that antidumping duties can *never* apply to subject merchandise imported with non-subject merchandise. It is instead that an input having a shorter useful life than the assembled product is not an *adequate reason* for doing so. None of Commerce's cited decisions relied on a shorter-useful-life rationale, and Commerce did not claim that they did.

**b.** Commerce's reliance on FRCs' lack of physical change when attached was likewise unreasonable. Commerce did not adequately substantiate its finding of no physical change. And even if it had, that still would not support a determination of no substantial transformation.

*First*, as a factual matter, Commerce did not give an adequate explanation or identify substantial evidence for its finding that FRCs do not undergo physical change when they are attached to a railcar. Respondents argued that FRCs do undergo physical changes when mounted—namely "the attachment of uncoupling levers." Appx6374 n.10; *see* Appx6556. Commerce found otherwise, however, by relying on two pieces of evidence: (1) Amsted's statement that FRCs "need to be accessible and removable" and (2) Strato's statement that "the physical nature of {FRCs} is not changed when they are removed from a railcar." Appx6556.

Even accepting them as true, both statements are irrelevant. The ultimate question is whether to include FRCs "that are attached to or mounted on railcars."

PUBLIC VERSION

Appx6554.  Thus, the relevant issue here would be whether FRCs are "substantially transformed into a distinct class or kind of merchandise when they are *attached* to a freight railcar," not when they are *removed*.  Appx6555 (emphasis added).  Yet Commerce's evidence purports to show only (1) that FRCs are *removable* and (2) that they do not change *when removed*.  Commerce provided no explanation, and cited no evidence, for rebutting Respondents' claim that FRCs physically change *when attached*.

*Second*, even if Commerce's finding had been factually sound, it would not support a determination of no substantial transformation.  As Respondents noted, many inputs are "not further manufactured or modified" when added to the assembled whole, but are still deemed an integral part of "a unitary, finished product."  Appx3717.  For instance, when Commerce found that washers (again, screws, not washing machines) incorporated into pole line hardware fell within an antidumping order on washers because they were physically "unmodified," this Court rejected that determination.  *MacLean Power*, 359 F. Supp. 3d at 1373; *supra* at 39; Appx3717 n.56; *see also Trendium Pool Prods., Inc. v. United States*, 399 F. Supp. 3d 1335, 1344 (CIT 2019) (cited at Appx3717 n.56) (making a similar ruling on steel incorporated into pool walls).

Here too, Commerce did not meaningfully engage with Respondents' concern, other than to claim Respondents relied on "hypothetical scenarios" and to identify other investigations where it included subject merchandise imported with non-subject merchandise in scope.  Appx6557.  As discussed, Commerce cannot avoid its

PUBLIC VERSION

duty to articulate rules that will not have absurd consequences in future cases. *Supra* at 44. And none of its cited decisions found a lack of physical alteration—or a lack of physical alteration combined with a shorter useful life—to be a sufficient basis for including subject merchandise imported with non-subject merchandise. *See* Appx6554–6555 n.49. Nor did Commerce claim they did. Moreover, regardless of what *Commerce's* precedents have held, *this Court's* precedents have rejected Commerce's lack-of-physical-alteration rationale. *Trendium Pool Prods.*, 399 F. Supp. 3d at 1344; *MacLean Power*, 359 F. Supp. 3d at 1373.

**c.** Although both of Commerce's rationales are flawed, remand is required even if only one of them is. When Commerce gives flawed explanations for its actions, remand is necessary unless "the error in question 'clearly had no bearing on the procedure used or the substance of decision reached.'" *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020). Since Commerce gave no indication that either of its two findings would on its own be an independent basis for finding no substantial transformation, remand is necessary even if only one is flawed.

<u>**CONCLUSION**</u>

For the reasons discussed above, Wabtec requests that this Court hold that Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law, and remand the *Final Determination* with instructions to issue a new determination that is consistent with this Court's decision.

**PUBLIC VERSION**

Respectfully submitted,

*/s/ David M. Morrell*
David M. Morrell
Ryan M. Proctor
Shelbie M. Rose

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated:  January 22, 2024

**PUBLIC VERSION**

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wabtec's Memorandum of Law in Support of its 56.2 Motion, as computed by Jones Day's word processing system Microsoft Word 2013, is 12,401 words, less than the 14,000 word limit.

<u>*/s/ David M. Morrell*</u>
David M. Morrell

*Counsel for Wabtec Corporation*

Dated: January 22, 2024