**PUBLIC VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |
|---|---|
| WABTEC CORPORATION | : |
| *Plaintiff,* | : |
| *and* | : |
| STRATO, INC., | : |
| *Plaintiff- Intervenor* | : |
| v. | : |
| UNITED STATES, | : |
| *Defendant,* | : |
| *and* | : |
| COALITION OF FREIGHT COUPLER PRODUCERS, | : |
| *Defendant-Intervenor.* | : |

Court No. 1:23-cv-00160

**NONCONFIDENTIAL VERSION**

BUSINESS PROPRIETARY INFORMATION REMOVED FROM PAGE 12

**REPLY IN SUPPORT OF PLAINTIFF'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

David M. Morrell
Ryan M. Proctor
Shelbie M. Rose
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated: May 17, 2024

**PUBLIC VERSION**

**TABLE OF CONTENTS**

**Page**

I.  COMMERCE UNLAWFULLY PERMITTED PETITIONER TO RELITIGATE THE FINAL DETERMINATIONS IN *FRC I*. ................................................. 1

    A.  Section 751(b)(4) Required the Dismissal or Termination of *FRC II*. ......... 1

        1.  Section 751(b)(4) bars review of negative final determinations ......... 1

        2.  Commerce's refusal to enforce Section 751(b)(4) must be remanded... 6

    B.  Commerce Unlawfully Ignored Its Inherent Authority. ............................. 8

II.  COMMERCE ERRED IN REFUSING TO EXCLUDE FRCS ATTACHED TO RAILCARS FROM THE SCOPE. ..................................................................... 9

    A.  "Attached FRCs" Cannot Be Within Scope Because the Underlying Theory of Injury Is Not Cognizable in Countervailing-Duty Proceedings. 9

        1.  Petitioner proposed including attached FRCs based on a non-cognizable theory of injury.................................................................. 10

        2.  Commerce unlawfully refused to tailor the scope to Petitioner's cognizable theories of injury ................................................... 13

    B.  Commerce Erred in Analyzing "Attached FRCs" Apart from Railcars. ................................................................................................. 14

    C.  Commerce Unlawfully Found No Substantial Transformation. .............. 22

        1.  Commerce failed to apply the proper legal standard..................... 22

        2.  Commerce's determination relied on flawed rationales and is unsupported by substantial evidence.............................................. 24

CONCLUSION.......................................................................................................... 25

CERTIFICATE OF COMPLIANCE ....................................................................... 27

PUBLIC VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Bausch & Lomb, Inc. v. United States,*
148 F.3d 1363 (Fed. Cir. 1998) ..........................................................16, 17

*Bell Supply Co. v. United States,*
888 F.3d 1222 (Fed. Cir. 2018) .........................................................20, 22

*Bestfoods v. United States,*
165 F.3d 1371 (Fed. Cir. 1999) ............................................................. 22

*Borden v. United States,*
593 U.S. 420 (2021) ................................................................................ 4

*Brown v. GSA,*
425 U.S. 820 (1976) .............................................................................. 12

*Canadian Solar, Inc. v. United States,*
918 F.3d 909 (Fed. Cir. 2019) ............................................................... 23

*City of Tacoma v. Taxpayers of Tacoma,*
357 U.S. 320 (1958) ................................................................................ 3

*Elkem Metals Co. v. United States,*
26 CIT 234, 193 F. Supp. 2d 1314 (2002) .............................................. 8

*Ellwood City Forge Co. v. United States,*
582 F. Supp. 3d 1259 (CIT 2022) ........................................................... 8

*Energizer Battery, Inc. v. United States,*
190 F. Supp. 3d 1308 (CIT 2016) ......................................................... 23

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) .............................................................................. 23

*Food Mktg. Inst. v. Argus Leader Media,*
588 U.S. 427 (2019) ................................................................................ 4

PUBLIC VERSION

*George v. McDonough,*
    596 U.S. 740 (2022) ................................................................ 4

*Guerrero-Lasprilla v. Barr,*
    589 U.S. 221 (2020) .............................................................. 19

*Inmax Sdn. Bhd. v. United States,*
    277 F. Supp. 3d 1367 (CIT 2017) ...................................... 5, 6

*Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,*
    10 CIT 424, 640 F. Supp. 255 (1986) ...................................... 8

*MacLean Power, L.L.C. v. United States,*
    359 F. Supp. 3d 1367 (CIT 2019) ...............................*passim*

*McCulloch Interstate Gas Corp. v. FPC,*
    536 F.2d 910 (10th Cir. 1976) ................................................ 4

*Meridian Prods., LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017) ........................................... 20

*Mittal Steel Point Lisas Ltd. v. United States,*
    542 F.3d 867 (Fed. Cir. 2008) ............................................. 12

*Nature's Touch Frozen Foods (W.) Inc. v. United States,*
    639 F. Supp. 3d 1287 (CIT 2023) ...................................12, 21

*Pomeroy Collection, Ltd. v. United States,*
    32 CIT 526, 559 F. Supp. 2d 1374 (2008) ........................... 16

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) .................................................................. 6

*Target Sportswear, Inc. v. United States,*
    70 F.3d 604 (Fed. Cir. 1995) ............................................... 22

*Torrington Co. v. United States,*
    14 CIT 507, 745 F. Supp. 718 (1990) ...........................19, 20, 22

*Torrington Co. v. United States,*
    938 F.2d 1276 (Fed. Cir. 1991) ........................................... 19

*Trendium Pool Prods., Inc. v. United States,*
    399 F. Supp. 3d 1335 (CIT 2019) ...................................13, 25

PUBLIC VERSION

*United States v. Citroen,*
  223 U.S. 407 (1912) ................................................................17, 18, 19

*United States v. Schoverling,*
  146 U.S. 76 (1892) ............................................................................ 18

*Wall v. Kholi,*
  562 U.S. 545 (2011) ............................................................................ 2

*Worthington v. Robbins,*
  139 U.S. 337 (1891) .......................................................................... 16

**STATUTES**

19 U.S.C. § 1500 ...................................................................................... 19

19 U.S.C. § 1671d .............................................................................1, 2, 5

19 U.S.C. § 1673 ............................................................................... *passim*

19 U.S.C. § 1673a ...................................................................................... 6

19 U.S.C. § 1673e .................................................................................... 11

19 U.S.C. § 1675 ............................................................................... *passim*

19 U.S.C. § 1677a .................................................................................... 11

19 U.S.C. § 1677k .................................................................................... 10

Fed. R. Civ. P. 12(b)(6) .....................................................................13, 20

Pub. L. No. 96-39, 93 Stat. 144 (1979) ................................................ 5, 19

**ADMINISTRATIVE MATERIALS**

19 C.F.R. § 207.5 (1978) ............................................................................ 5

19 C.F.R. § 351.204 .................................................................................... 7

*New Eng. Conf. of Pub. Utils. Commiss'rs, Inc.,*
  135 FERC ¶ 61,140 (2011) ...................................................................... 4

PUBLIC VERSION

## I. COMMERCE UNLAWFULLY PERMITTED PETITIONER TO RELITIGATE THE FINAL DETERMINATIONS IN *FRC I*.

Petitioner should never have been allowed to launch a second investigation into FRCs from China on the heels of the negative determination in *FRC I*. In permitting the investigation to go forward, Commerce misconstrued Section 751(b)(4) of the Tariff Act and failed to recognize its inherent authority to enforce the finality of negative determinations in previous investigations. Both errors independently require remand.

### A. Section 751(b)(4) Required the Dismissal or Termination of *FRC II*.

Section 751(b)(4) prohibits "review" of final injury determinations, affirmative *and negative*, within two years, absent a showing of good cause. Here, the Petition sought reconsideration of whether FRCs from China cause injury within two years of the ITC's negative final determination in *FRC I*. Yet Commerce initiated a second investigation without finding good cause. That decision, and Commerce's subsequent failure to terminate the investigation, was contrary to law.

#### 1. Section 751(b)(4) bars review of negative final determinations.

Section 751(b)(4) bars "review" of *any* "determination made under section 1671d(b) or 1673d(b)," which encompasses both affirmative *and negative* final determinations of injury. 19 U.S.C. § 1675(b)(4). Despite this clear statutory text, Defendants insist the provision applies only to "changed circumstances reviews"—*i.e.*, reviews of final *affirmative* determinations under the procedures set forth in Section 751(b)(1). This reading has no basis in text, structure, history, or precedent.

Defendants say nothing about the text of Section 751(b)(4) itself. They do not contest that a negative final injury determination is "a determination made under section 1671d(b) or 1673d(b)." *Id.* Nor do they dispute that, in a legal context, the term

1

"review" encompasses a "reexamination" of a prior "judgment or claim," even in a "collateral" proceeding. *See Wall v. Kholi*, 562 U.S. 545, 553 (2011). That should be the end of the matter.

Nevertheless, Defendants insist that Section 751(b)(4) means something other than what it says when read against the previous three paragraphs of subsection (b). Gov't Br. 16–17; Pet'r Br. 13. But that context only further undermines their reading. The previous three paragraphs are by their terms limited to review of *affirmative* determinations. Wabtec Br. 14. That Congress was careful to limit the scope of paragraphs (1) through (3) in this way underscores that its decision to extend paragraph (4) to *all* final determinations was deliberate. *Id.* at 14–15.

The Government similarly contends that "review" in Section 751(b)(4) can only refer to review through a special "type of proceeding" established in Section 751 because that is how other provisions within Section 751 use the term. Gov't Br. 18–19. But the other provisions are limited to special review proceedings *by their terms*: they *authorize or require* review of *a subset of affirmative determinations*, and lay down rules for those reviews. *See* 19 U.S.C. § 1675(a)(1), (b)(1), (c)(1), (g)(1), (g)(2). In contrast, nothing in Section 751(b)(4) limits its reach to special review proceedings: it broadly prohibits review of *all* final determinations within two years. The other provisions create *exceptions* to the general rule of finality and so are narrow; Section 751(b)(4) *enforces* the general rule of finality and so broadly prohibits any review within two years without good cause.

The specific context of subsection (b) reinforces that Congress did not give "review" a narrow technical meaning in Section 751(b)(4). Paragraph (1) requires

**PUBLIC VERSION**

Commerce and the ITC to "*conduct a review* of the determination" when certain conditions are met. *Id.* § 1675(b)(1) (emphasis added). Section 751 consistently uses this formulation—"conduct a review"—to refer to the action of carrying out a special review proceeding. *See id.* § 1675(a)(2)(B)(i), (a)(2)(B)(4), (c)(1), (e), (g)(1)–(3). Paragraphs (2) and (3) likewise refer to "conducting a review" and "a review conducted." *Id.* § 1675(b)(2)–(3). But paragraph (4) does not use this phrase; it provides that Commerce and the ITC "may not review" final determinations. *Id.* § 1675(b)(4). And elsewhere, Section 751 uses the verb "review" in this more ordinary sense—simply to mean "reexamine" or "reconsider," not "conduct a special proceeding." *See id.* § 1675(a)(1)(A)–(B) (requiring Commerce, *within* a review proceeding, to "review … the amount of any" countervailable subsidy and antidumping duty). Once again, the variation in the wording of subsection (b) implies a variation in meaning.

Nor is Section 751(b) an unexpected home for a prohibition on collaterally attacking final Commerce and ITC determinations. *See* Gov't Br. 19. A time bar on collateral review naturally belongs in a section entitled "Administrative review of determinations." And unlike the other provisions of Section 751, subsection (b) specifically addresses under what circumstances a party can request reconsideration of past determinations.

The detailed remedial scheme established by the Tariff Act, culminating with "exclusive jurisdiction" in this Court to review Commerce's and the ITC's final determinations, reinforces that a petitioner cannot use a second petition as a vehicle to nullify an unfavorable outcome in an earlier petition. Wabtec Br. 15–16. The Government acknowledges that, under *City of Tacoma v. Taxpayers of Tacoma*, 357

3

**PUBLIC VERSION**

U.S. 320 (1958), "exclusive jurisdiction provisions" generally prohibit "other tribunals" from reexamining "relevant agency orders." Gov't Br. 26. It overlooks, however, that this prohibition also covers *the agency itself*. The Federal Energy Regulatory Commission, for instance, deems as a "prohibited … collateral attack" a nominally new proceeding *before itself* that amounts to "an attack on a Commission final order in a proceeding other than on direct appeal." *New Eng. Conf. of Pub. Utils. Commiss'rs, Inc.*, 135 FERC ¶ 61,140, P 28 (2011); *see McCulloch Interstate Gas Corp. v. FPC*, 536 F.2d 910, 912 (10th Cir. 1976) (upholding such a finding). Under the same logic, Petitioner cannot circumvent the Tariff Act's exclusive-review provision by filing a second petition with Commerce. Section 751(b)(4) makes that structural inference explicit.

With no footing in the ordinary meaning or structure of Section 751(b)(4), Defendants urge that this provision nonetheless applies only to reviews under Section 751(b)(1) because "changed circumstances review" is a term of art. Gov't Br. 17; Pet'r Br. 14. However, "{t}he first precondition of any term-of-art reading is that the term be present in the disputed statute." *Borden v. United States*, 593 U.S. 420, 435 (2021) (plurality opinion). Here, the phrase "changed circumstances review" appears nowhere in Section 751. The closest formulation is Section 751(b)'s title—"Reviews based on changed circumstances"—but that still does not cut it. Because terms of art depart from the ordinary meaning of their constituent words, one cannot discover a term of art "by rearranging the text" of a statute "to create a phrase that does not appear" in it. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 438 (2019) (holding the phrase "commercial … information {that is} … confidential" is not equivalent to the term of art "confidential commercial information"). And even if subsection (b)'s title contained the

4

**PUBLIC VERSION**

phrase, Defendants concede that a title cannot trump the plain meaning of Section 751(b)(4)'s operative text.  Gov't Br. 20; Pet'r Br. 14.

Further, Defendants cannot even show that "changed circumstances review" (or, for that matter, "reviews based on changed circumstances") is a *preexisting* term of art. A term of art bears on the original meaning of a provision only if it was "transplanted" from an earlier "legal source." *George v. McDonough*, 596 U.S. 740, 746 (2022).  But Defendants cite no instance of either phrase predating Section 751's enactment in 1979, *see* Pub. L. No. 96-39, § 101, 93 Stat. 144, 175–76 (1979), and Wabtec is aware of none either.  *See* Gov't Br. 17; Pet'r Br. 14.

Even Section 751(b)(4)'s "regulatory precursor" reinforces that the provision extends beyond so-called changed circumstances reviews.  *See* Gov't Br. 17.  The old regulation prohibited review within two years of the Secretary's "*finding of dumping*." 19 C.F.R. § 207.5(c) (1978) (emphasis added).  Thus, by its terms, it covered only affirmative determinations.    Section 751(b)(4), in contrast, bars review of *any* "determination under section 1671d(b) or 1673d(b)."  19 U.S.C. § 1675(b)(4).  Rather than codify the preexisting regulatory language, Congress *expanded* the scope of the time bar to cover negative determinations.  That distinct textual choice must be given effect.

Finally, Defendants' invocation of precedent also falls flat.  The Government cites *Inmax Sdn. Bhd. v. United States* (Gov't Br. 15),  but that decision held only that so-called changed circumstances reviews of affirmative determinations are subject to Section 751(b)(4); it did not address whether those are the *only* reviews the provision covers.  277 F. Supp. 3d 1367, 1370–71 (CIT 2017).  That question was not even

5

**PUBLIC VERSION**

presented.  Nor can Defendants identify a single instance where Commerce initiated an investigation within two years of a final determination on the same imports.  *See* Gov't Br. 22–23 (citing initiations *over two years* after a previous determination); Pet'r Br. 11 (citing initiation following a previous determination on imports *from different countries*).  Experience and practice reinforce what is clear from the text: dissatisfied petitioners cannot force review of a prior negative determination within two years absent good cause.  Without such a rule, nothing would stop dissatisfied petitioners, who lose fair and square, from filing new petitions the very day they receive an adverse decision—a scenario not so far from what happened here.  And recognizing such a rule here would merely make explicit what is clear from the text and implicit in longstanding practice, as this case was, to our knowledge, a first of its kind.

### 2.  Commerce's refusal to enforce Section 751(b)(4) must be remanded.

Since Commerce's sole rationale for refusing to enforce Section 751(b)(4)—that it only applies to changed circumstances reviews—is wrong, remand is necessary.  Defendants' attempts to save Commerce's decision on alternative grounds uniformly fail.

*First*, the Government falsely claims it is undisputed that the initiation requirements of Section 732(b)(1) were met.  *See* Gov't Br. 13–15.  To the contrary, the petition must "allege{} the elements" of an antidumping claim, including injury.  19 U.S.C. § 1673a(b)(1).  Since Petitioner's allegations of injury required reexamining the very imports ruled non-injurious in *FRC I*, the Petition did not properly allege this element because it did not allege good cause.  Wabtec Br. 19.

Petitioner objects that it is the ITC's role to consider injury, not Commerce's.  Pet'r Br. 8, 9 n.1.  But as Petitioner later concedes, at initiation, Commerce must assess

**PUBLIC VERSION**

the adequacy of the petition's allegations on *all* elements, including injury. *Id.* at 9.; *see* Wabtec Br. 28–29.

*Second*, Defendants claim that, even on Wabtec's interpretation of Section 751(b)(4), *FRC II* did not seek "review" of *FRC I* due to certain distinctions between the two investigations. *See* Gov't Br. 21–23; Pet'r Br. 7–11. They never claim *Commerce* made any such finding, however. *See* Wabtec Br. 18. Defendants may not justify Commerce's decision based on reasoning it never gave. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Defendants are also wrong. They agree that all the merchandise in scope in *FRC II* was in scope in *FRC I*. *See* Pet'r Br. 4. They agree that two of the three years of the POIs for determining injury in the two investigations overlapped. *See* Gov't Br. 22 n.9; Pet'r Br. 8–9. And they do not contest that, although cumulation may affect how the ITC makes its injury determination, it ultimately issues a distinct determination for each country. *See* Gov't Br. 22. They have no basis to deny, then, that a substantial majority of the entries Petitioner alleged to be injurious had already been found non-injurious in *FRC I*. Petitioner could thus prevail only by the ITC reviewing—and then upsetting—that prior determination.

Petitioner insists there is no relevant overlap in the POIs because *Commerce's* POI in *FRC II* covered the first half of 2022, while it covered the first half of 2021 in *FRC I*. Pet'r Br. 5, 7. But those are the POIs for determining whether foreign exporters are "dumping." *See* 19 C.F.R. § 351.204(a), (b)(1). To determine injury, the ITC uses a different, usually three-year POI, as Petitioner acknowledges. Pet'r Br. 8–9. In assessing the sufficiency of a petitioner's allegations *of injury*, Commerce estimates the

POI the ITC is likely to use. *See* Appx3227. Here, the POI Petitioner proposed and Commerce used (January 2019 to June 2022) overlapped *even more* with *FRC I* (January 2019 to December 2021) than the POI the ITC ultimately used (January 2020 to December 2022). Wabtec Br. 7. Commerce thus necessarily deemed sufficient allegations that entries already determined non-injurious in *FRC I* were causing injury in *FRC II*.

*Finally*, Commerce's assertion that it "has no authority to terminate {an} investigation" once initiated poses no obstacle to remand. *See* Appx6725. To begin with, neither Defendant disputes that the lawfulness of the initiation decision itself is properly before this Court. *See* Wabtec Br. 20 n.8. Remand is therefore necessary regardless of whether Commerce had authority to terminate the investigation at a later point. But in any event, the Government has essentially confessed error on this issue, finding it "unremarkable" that Commerce may terminate an investigation unlawfully initiated. Gov't Br. 23–24. And even the case Petitioner cites (Pet'r Br. 18) recognizes Commerce has the "power … to terminate" when a respondent identifies "a fundamental defect in the petition," as opposed to mere "inaccuracies" in the petition's supporting evidence that can be corrected. *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 10 CIT 424, 427, 640 F. Supp. 255, 258 (1986).

## B. Commerce Unlawfully Ignored Its Inherent Authority.

Commerce also erred in determining it had no inherent authority to terminate *FRC II* as an attempt to relitigate *FRC I* without a valid justification.

The Government claims Wabtec failed to exhaust and forfeited this argument. Gov't Br. 25–26. This is simply false. Both before Commerce and in its opening brief, Wabtec argued that (1) Commerce has the inherent authority to protect the integrity of

its proceedings and (2) this authority includes the power to terminate investigations that undermine the finality of an earlier determination, citing legal authority to support both premises.  Wabtec Br. 20–21; Appx6397–6399.  That is more than enough to give Commerce and Defendants "fair notice" of "its legal arguments."  *Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1280 (CIT 2022).

Petitioner claims Commerce's inherent authority to regulate its proceedings extends *only* to addressing fraud.  Pet'r Br. 19.  Not so.  It may be "particularly appropriate" for Commerce to exercise its inherent authority to address fraud, but the authority extends more generally to actions warranted "to vindicate the integrity of the administrative process."  *Elkem Metals Co. v. United States*, 26 CIT 234, 239–40, 193 F. Supp. 2d 1314, 1320–21 (2002).  This includes where a dissatisfied petitioner attempts to relitigate issues definitively resolved just weeks before filing a new petition.

## II.  COMMERCE ERRED IN REFUSING TO EXCLUDE FRCS ATTACHED TO RAILCARS FROM THE SCOPE.

The investigation in *FRC II* should never have gotten off the ground.  But at minimum, for three independent reasons, it was unlawful for Commerce to include within scope FRCs that enter the country attached to railcars.

### A.  "Attached FRCs" Cannot Be Within Scope Because the Underlying Theory of Injury Is Not Cognizable in These Antidumping Proceedings.

Petitioner proposed including attached FRCs in scope based on a non-cognizable theory of injury.  Commerce's acceptance of that scope language was therefore unlawful.

PUBLIC VERSION

1.  **Petitioner proposed including attached FRCs based on a non-cognizable theory of injury.**

Antidumping duties may be imposed only where the domestic industry is injured "by reason of imports" of subject merchandise.  19 U.S.C. § 1673(2).  This means the *act of importing* subject merchandise must be a but-for cause of the injury.  Wabtec Br. 24–26.  Since the only injury Petitioner alleged from attached FRCs is lost *export* sales, attached FRCs cannot be included in scope as a matter of law.  *Id.* at 22–23.

Defendants do not address the language of Section 731(2) at all, instead training their fire on a strawman of Wabtec's position.  The Government asserts Wabtec's theory is that imports of attached FRCs are not "imports of subject merchandise," making it "merely another variant" of Wabtec's claim that no substantial transformation occurs.  Gov't Br. 39.  This is incorrect.  Even assuming complete railcars entering the U.S. count as imports of FRCs, the *act of importing* them is not, under Petitioner's own theory, what *causes injury* to the domestic industry.  Wabtec Br. 31–32.  Even accepting Petitioner's allegations, any injury caused by an attached FRC occurs before that point, when domestic producers lose an *export sale* to Mexican OEMs.  No further injury occurs when such an FRC enters the country, since attached FRCs do not compete in the domestic market for FRCs.  *Id.*  There may be an injury and there may be an import, but because the import does not cause the injury, attached FRCs cannot satisfy all the elements of an antidumping claim under Section 731.

The Government also appeals to Section 772(a), which it claims defines the "export price" for attached FRCs as the price at which Chinese manufacturers sell

FRCs to Mexican OEMs. Gov't Br. 40 (citing 19 U.S.C. § 1677a(a)). This is a *non sequitur*. The export price is used to determine the dumping margin. 19 U.S.C. § 1673e(a)(1). It is not used to establish injury or causation, which are separate inquiries. The Government's point suggests only that *if* a Mexican OEM exports a completed railcar to the United States, the price at which it purchased the railcar's FRC from China is considered the FRC's export price. But that does not change that the domestic industry suffers the same injury *regardless* of whether the railcar is sold to the United States or somewhere else. Indeed, the *Final Scope Memorandum* cited Section 772(a) only in response to a distinct argument by Amsted that Mexican OEMs do not qualify as exporters of subject merchandise, not Wabtec's argument about cognizable injury. Appx6557.

The existence of a narrower remedial scheme specifically aimed at *third-country* dumping also reinforces the impropriety of using antidumping duties under Section 731 to address harms caused by lost export sales. 19 U.S.C. § 1677k; *see* Wabtec Br. 25–26. Petitioner objects that it chose to "ple{a}d" its case "as an antidumping duty petition" under Section 731, not a third-country dumping petition. Pet'r Br. 23. But that is precisely the problem. Of course Petitioner does not *want* to channel its claims through the narrower and less certain avenue of petitioning the Trade Representative to lobby Mexican officials to institute their own proceedings, as Section 1677k contemplates. But given the sensitive foreign-policy implications of regulating imports into third countries—implications both Defendants ignore—Congress determined that a more limited, diplomacy-based remedial scheme was warranted. *See* Wabtec Br. 25–26. That "careful and thorough remedial scheme"

may not "be circumvented by artful pleading." *Brown v. GSA*, 425 U.S. 820, 833 (1976).

Petitioner also insists it did properly allege injury "*in the United States*" market, not from third-country dumping. Pet'r Br. 23–24. That may be true (setting aside, for the moment, Section 751(b)(4)) of *unattached* FRCs, but regarding *attached* FRCs, its theory has always been that the domestic industry is injured because dumped Chinese FRCs "compete head-to-head for sales to rail car producers *in Mexico*." Appx3800 (emphasis added); *see also* Appx2470–2472 (including under "Conditions of Competition" the importation of "Chinese railcar couplers … into Mexico"); Appx80124 (including "[                    ]" in the domestic industry's "Market Share").

Petitioner identifies no place where it alleged how imports of attached FRCs could possibly affect the domestic market for FRCs. In fact, the Petition's own allegations exclude the possibility of injury due to imports of *attached* FRCs. According to the Petition, the domestic market for FRCs comprises (i) domestic OEMs and (ii) purchasers in the replacement market (*e.g.*, railroads). Appx2475–2476; *see* Wabtec Br. 6–7. It is undisputed that once attached to a railcar, an FRC remains attached *to that railcar* for the remainder of its "useful life." Appx2470; *see also* Appx3486. So a domestic OEM or purchaser on the replacement market would never purchase an FRC that entered the country *already attached* in lieu of a domestically produced FRC—which is to say, under Petitioner's own theory, *imports* of attached

**PUBLIC VERSION**

FRCs would never injure domestic industry.

## 2. Commerce unlawfully refused to tailor the scope to Petitioner's cognizable theories of injury.

Defendants agree that Commerce has authority to narrow a proposed scope that is "overly broad … or in any other way defective." Gov't Br. 28. Since attached FRCs as a matter of law cannot be subjected to antidumping duties, Commerce should have exercised that authority to exclude them from the scope. Its failure to do so—or to at least give a reasonable explanation for not doing so—was contrary to law.

Commerce nevertheless insisted it was powerless to narrow Petitioner's proposed scope because matters of injury are solely for the ITC. In this Court, Defendants likewise scold Wabtec for supposedly failing to understand the basic division of authority between the two agencies. *Id.* at 40–41; Pet'r Br. 19–22. For three independent reasons, however, they are mistaken.

*First*, Commerce had a duty to determine whether Petitioner's allegations stated a valid theory of injury and causation at initiation. Wabtec Br. 28–31. Despite all their objections, Defendants concede that Commerce must assess all the elements of an antidumping claim at initiation, including injury and causation. Gov't Br. 12–13; Pet'r Br. 21. They also agree with Wabtec's analogy that Commerce's role at initiation is like a court's when resolving a motion to dismiss under Rule 12(b)(6). *See* Wabtec Br. 30–31; Pet'r Br. 18, 21 ("A petition functions like a civil complaint" and must be dismissed where it "fail{s} to state a claim upon which relief could be granted" (cleaned up)); Gov't Br. 14 n.6 (similar). Commerce thus had a duty to determine whether Petitioner's allegations would, if true, establish injury and causation. Had it correctly performed that duty, it would have found Petitioner's proposed scope

**PUBLIC VERSION**

overbroad, an "important aspect of the problem" it could not have simply ignored when defining the investigation's initial scope. *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 872 (Fed. Cir. 2008).

*Second*, Commerce *in fact* found Petitioner's theory of injury defective in part at initiation when it determined that Petitioner had wrongly included "U.S. export shipments" in its definition of the U.S. market for FRCs. Appx2561; Wabtec Br. 23, 26–27. It was inconsistent of Commerce, having identified this defect, to bless a proposed scope premised on it. Defendants have no response to this point other than a conclusory footnote from Petitioner, Pet'r Br. 23 n.3, thereby forfeiting any argument to the contrary, *Nature's Touch Frozen Foods (W.) Inc. v. United States*, 639 F. Supp. 3d 1287, 1299 (CIT 2023).

*Third*, the *Preamble* to Commerce's regulations, to which Commerce explicitly pledged to adhere in this case, affirms that Commerce has a post-initiation duty to tailor the scope to Petitioner's legitimate claims of injury in response to importers' comments. Wabtec Br. 29. Defendants do not mention this point *at all*, again forfeiting any objection to it. What Defendants dismiss as Wabtec's "fundamental error"—its claim that Commerce can and must consider whether Petitioner's proposed scope aligns with legally cognizable allegations of injury—is in fact a truth not genuinely in dispute. Pet'r Br. 20.

## B.   Commerce Erred in Analyzing " Attached FRCs" Apart from Railcars.

Separate and independent of the foregoing, Commerce further erred in its scope determination by improperly framing its class-or-kind analysis. Commerce had a statutory duty to ensure all the products in the proposed scope were of the same "class

PUBLIC VERSION

or kind of foreign merchandise." 19 U.S.C. § 1673(1). In doing so, it was further required to follow the "ancient principle" that "merchandise" must be assessed "in the condition in which it is imported." *MacLean Power, L.L.C. v. United States*, 359 F. Supp. 3d 1367, 1371 (CIT 2019). Since attached FRCs are by definition imported attached to a railcar, this meant Commerce had to ask whether *railcars* (*i.e.*, what comes across the border) are of the same class or kind as *FRCs* (*i.e.*, the product targeted for investigation). Since all agree they are not, that should have ended the matter. Instead, Commerce asked whether *attached* FRCs are of the same class or kind as *unattached* FRCs to justify its scope. *See* Wabtec Br. 32–41. That was error.

Defendants contest very little of Wabtec's argument. The Government does not dispute that the scope must be limited to a single class or kind of merchandise. Nor do Defendants deny that railcars and FRCs are separate classes or kinds of merchandise and that Commerce failed to analyze attached FRCs in the condition in which they are imported. They instead argue Commerce has no obligation to analyze merchandise in its imported condition. Gov't Br. 37–38; Pet'r Br. 35–36. But this Court has already explicitly held otherwise. *See MacLean Power*, 359 F. Supp. 3d at 1371 ("the duty to consider the merchandise in the condition in which it is imported applies to additional unfair trade duties"); *Trendium Pool Prods., Inc. v. United States*, 399 F. Supp. 3d 1335, 1343 n.3 (CIT 2019) (following *MacLean Power*). Defendants identify no valid basis for disregarding these precedents.

*First*, the Government claims *MacLean Power* is distinguishable because it involved a *ruling* on an existing order rather than an initial scope *determination*. *See* Gov't Br. 35–37 & n.13. This difference is immaterial, however, because both are

15

features of the same analytical framework.  For scope determinations and rulings alike, the first analytical step is to identify the merchandise at issue.  In scope determinations, this step is followed by the question whether such merchandise, having been identified, is of a single class or kind of merchandise (if it is not, Commerce must define the scope to cover only a single class or kind, *see* Wabtec Br. 33).  In scope rulings, the merchandise is identified before asking whether it fits within the terms of the scope (which, if Commerce has done its job, covers only a single class or kind of merchandise).  But in both cases the first analytical step is the same: what is the merchandise at issue?

And this question, in turn, logically requires some fixed point of reference, a common place where the law directs all involved to look for and evaluate the merchandise—*before* asking whether it is a single class or kind (for scope-determination purposes) or whether it fits within the terms of the scope (for scope-ruling purposes).  The only sensible candidate for this fixed point is the U.S. border, where duties are assessed and U.S. officials are actually able to examine the merchandise.  After all, it would make little sense to consider the nature of merchandise as it sits on a factory floor, say, in China.  It is thus unsurprising that courts have long recognized the duty to consider merchandise in its *imported* condition.

Courts first articulated this duty in "tariff classification" cases.  *MacLean Power*, 359 F. Supp. 3d at 1371.  Consistent with the framework described above, in such cases the decisionmaker *first* "determines what the merchandise at issue is, … and *then* … the proper classification under which it falls."  *Bausch & Lomb, Inc. v.*

PUBLIC VERSION

*United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1998) (emphasis added). Embedded in the first step is the principle that the merchandise must be evaluated as imported. *See, e.g.*, *United States v. Citroen*, 223 U.S. 407, 414–15 (1912) (pearls were not properly classified as "pearls set or strung" because "they were imported" *without* "string or clasp").

*MacLean Power* extended this principle to scope rulings, which makes sense. Although a scope ruling does not involve tariff classifications under the HTS, the determinations are analogous, as *MacLean Power* itself recognized. In scope rulings, Commerce must determine "whether the product *as imported* falls under the 'class or kind of merchandise' encompassed by the language of the order," "which for these purposes substitutes for tariff classification terms." 359 F. Supp. 3d at 1371 (emphasis added).

Nor would it make any sense to require Commerce to consider merchandise as imported only in scope *rulings*. Defining scope and applying scope are two sides of the same coin. The point of both is to assess the same duties on the same products upon importation at the border. It would be incoherent to use different points of reference—how the merchandise is imported for scope rulings and some other principle for defining scope—when both govern the same act of importation. Thus, even in setting the scope, Commerce must first "judge{}" "the merchandise in the condition in which it is imported." *Id.*[1] Only then may it decide whether the merchandise, as imported, makes up more than one class or kind.

---

[1] This explains why *MacLean Power*, before even considering "the language of the Order," first determined that the product at issue was "pole line hardware," not the washers contained within it. 359 F. Supp. 3d at 1371–72.

*Second*, the Government claims the duty to consider merchandise as imported is a mere "Customs rule{}" that cannot bind Commerce. Gov't Br. 37. But although Customs and Border Protection "has a merely ministerial role" and may not bind Commerce in the enforcement of the antidumping laws, *id.*, the duty to consider merchandise as imported is not an administrative determination or policy issued *by Customs*. It is instead a principle of law developed *by courts* to which both Customs and Commerce are subject.

To start, the Government's contrary argument is squarely inconsistent with *MacLean Power*, which held that this principle involving condition of import applies to antidumping and countervailing duties, not just ordinary customs duties. This makes sense, since Customs collects both and, further, only has jurisdiction over merchandise upon importation. *MacLean Power*'s holding is also supported by history and longstanding precedent. As far back as 1912, "{t}he rule {was} well established that … 'the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported.'" *Citroen*, 223 U.S. at 414–15. This "rule" was plainly one of law that *limited* administrative discretion, not an *exercise* of discretion to which courts deferred. The Supreme Court derived the rule from the need "to produce uniformity in the imposition of duties," not by looking to any practice by Customs. *Id.* at 414. And where Customs did not adhere to this rule, courts held—and still hold today— that the importer was entitled *as a matter of law* to a different classification and duty rate. *See, e.g.*, *United States v. Schoverling*, 146 U.S. 76, 79, 82 (1892); *Worthington v. Robbins*, 139 U.S. 337, 338, 340, 342 (1891); *Pomeroy Collection, Ltd. v. United*

PUBLIC VERSION

*States*, 32 CIT 526, 528, 559 F. Supp. 2d 1374, 1378 (2008).

Courts must "assume that Congress is 'aware of relevant judicial precedent' when it enacts a new statute." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233 (2020). Here, long before Congress enacted Section 731 in 1979, *see* Pub. L. No. 96-39, § 101, 93 Stat. at 162, this rule governing "the imposition of duties" was "well established." *Citroen*, 223 U.S. at 414–15. Section 731 provides that antidumping duties are a "duty" "imposed" on "foreign merchandise"—not a "penalty," "fine," "fee," "tax," or some other kind of exaction. 19 U.S.C. § 1673. It further equates an "antidumping duty" with other import duties by providing that it is required "in addition to any *other duty* imposed." *Id.* (emphasis added). And Congress also directed that antidumping duties be assessed on merchandise by Customs as it enters the country, just like ordinary duties. *Id.* § 1500(c). Thus, "we should assume that Congress … would have intended" for this rule governing ordinary import duties to apply to antidumping duties as well. *Guerrero-Lasprilla*, 589 U.S. at 233–34.

*Third*, Defendants emphasize that Petitioner's proposed scope language clearly included attached FRCs. *See* Gov't Br. 36; Pet'r Br 26–27, 29–30. But it is "improper{}" for Petitioner to include "two classes or kinds of merchandise" in a single scope. *Torrington Co. v. United States*, 14 CIT 507, 510, 745 F. Supp. 718, 720 (1990), *aff'd*, 938 F.2d 1276 (Fed. Cir. 1991). And for the reasons just discussed, when determining class or kind, Commerce has a legal duty to analyze the merchandise in the condition in which it is imported. Calling the product an "attached FRC" rather than a railcar is thus a *legal conclusion*, not the *starting point* of a proper analysis. Deferring to that conclusion would be like a court on 12(b)(6) review finding the

**PUBLIC VERSION**

plaintiff had adequately pleaded negligence simply because the complaint labeled the defendant's action "negligent." Labeling the product as an "attached FRC" cannot override the principle that, in the eyes of U.S. law, it is a railcar that crosses the border and thus provides the point of departure for a proper scope analysis, whether in a scope ruling or a scope determination.

There is, however, one difference between scope determinations and scope rulings that *does* matter. Both *MacLean Power* and *Trendium* emphasized the lack of scope language stating that subject merchandise remained in-scope when incorporated into other products. *See* Gov't Br. 35; Pet'r Br. 34–35. Because those were scope *ruling* cases, and scope rulings may "not modify or amend" "the terms of the original order," such language would have been dispositive. *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1380 (Fed. Cir. 2017). But in the scope-*determination* context, a petitioner's proposed scope language is not dispositive if it "improperly fails to" "distinguish{} between two classes or kinds of merchandise." *Torrington*, 14 CIT at 510, 745 F. Supp. at 720. That Petitioner clearly proposed including attached FRCs does not answer whether Petitioner did so *properly*.

Indeed, Commerce's uncritical deference to Petitioner's proposed scope language made its class-or-kind analysis not just wrong, but incoherent. Commerce framed the inquiry as whether FRCs are "substantially transformed" when "attached to a freight railcar." Appx6555. But as the Government recognizes, Gov't Br. 33 n.12, "the substantial transformation analysis is used to determine country of origin for an imported article," not its class or kind. *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018). In fact, one of the substantial-transformation factors is

20

**PUBLIC VERSION**

whether additional processing has changed the product's "class or kind." *Id.*  The test

thus *assumes* there is some other metric for determining class or kind; it is circular

to use it to *determine* a product's class or kind, as Commerce did.

*Fourth*, administrative precedent is not to the contrary.  Defendants cite other

scopes specifying that subject merchandise remains in scope when imported with

non-subject merchandise.  *See* Gov't Br. 38; Pet'r Br. 28–29.  But such scopes are not

categorically prohibited.  They *can be* lawful with a proper justification, such as when

the mixed-media test is satisfied (which Commerce never considered), or when the

combined product is of the same class or kind as the unattached input (which

Commerce never found).  Wabtec Br. 37–39.  But Defendants identify no case where

Commerce simply concluded it did not have to consider merchandise as imported.

And regardless of what Commerce has done, *this Court* has expressed serious doubts

about Commerce's "statutory authority" to "impos{e} countervailing"—and by the

same logic, antidumping—"duties only upon an ingredient in the imported

merchandise, not the merchandise itself."  *Mosaic Co. v. United States*, 659 F. Supp.

3d 1285, 1295 (CIT 2023).

*Finally*, Petitioner is flat-out wrong to argue that an antidumping order can

cover multiple classes or kinds of merchandise.  Pet'r Br. 25–26.  This argument

contradicts Commerce precedent, Wabtec Br. 33, 34 n.11, and the plain language of

the statute, which is presumably why the Government does not make it.  And

*Torrington*, on which Petitioner relies, upheld Commerce's decision to divide a

proposed scope into five distinct investigations because "the petition improperly

fail{ed}" to "distinguish{}" the five "classes or kinds of merchandise" involved.  14 CIT

at 509–10, 745 F. Supp. at 720.

## C.    Commerce Unlawfully Found No Substantial Transformation.

Even if the inquiry is properly framed as whether FRCs are substantially transformed when attached to railcars, Commerce's decision was still unlawful. Commerce applied the wrong legal standard, relied on flawed rationales, and reached findings unsupported by substantial evidence.

### 1.    Commerce failed to apply the proper legal standard.

Though Commerce claimed that the substantial-transformation test governed its inquiry, it failed to cite, much less apply, the five factors laid out in *Bell Supply*. Wabtec Br. 41–42.  The Government's two counters to this point fail.  Gov't Br. 33–34.

*First*, although *Bell Supply* was a scope-ruling case, its factors are not limited to the scope-ruling context.  The Court observed that "the substantial transformation test is recognized and well-established in cases involving country of origin determinations" generally.  *Bell Supply*, 888 F.3d at 1229 (quoting *Target Sportswear, Inc. v. United States*, 70 F.3d 604, 605 (Fed. Cir. 1995)).  The case it quoted, for instance, involved a Customs regulation relating to import quotas.  *Target Sportswear*, 70 F.3d at 605.  And its factors speak generally to "whether there has been a substantial transformation," not anything specific to scope rulings.  *Bell Supply*, 888 F.3d at 1228–29.  In fact, the Court defined the ultimate inquiry as whether the product has been "transformed into a new product having a new name, character and use."  *Id.* at 1228 (quoting *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).  That is the precise line and case Commerce cited when discussing the substantial-transformation test.  Appx6557 & n.65.  Further, the Federal Circuit has cited *Bell Supply* as setting forth "the substantial transformation test" in a case

**PUBLIC VERSION**

involving an initial scope determination. *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir. 2019). Even Petitioner acknowledges *Bell Supply* establishes in this case the "factors" used "to determine whether a product has been substantially transformed." Pet'r Br. 27.

Since Commerce never indicated it was applying a nonstandard version of the substantial-transformation test, it *did* "need {to} apply the same analysis" it ordinarily does under that test. *See* Gov't Br. 33. If Commerce wants to alter the test in the scope-determination context, it must "display awareness that it *is* changing position" and "provide reasoned explanation for its action"; it cannot "depart from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

*Second*, Commerce did not make a "threshold" finding that it need not consider the *Bell Supply* factors because attaching an FRC involves *no processing at all*. *See* Gov't Br. 33–34. It instead found FRCs "do not undergo *further* processing" when attached, *i.e.*, processing *beyond* the act of attachment. Appx6556 (emphasis added). It is well established that even the simple "assembly" of prefabricated components is a form of "processing" under the substantial-transformation test. *Energizer Battery, Inc. v. United States*, 190 F. Supp. 3d 1308, 1318–19 (CIT 2016). And the scope language itself recognizes that FRCs are "processed" when "attached to a railcar." Appx6565. Since attached FRCs undergo at least *some* processing, Commerce was not free to ignore the other *Bell Supply* factors. And even if the Government's no-processing-at-all reading of the *Final Scope Memorandum* were correct, remand would still be necessary because Commerce's reasoning would be inconsistent with caselaw and the very scope language it approved.

PUBLIC VERSION

### 2. Commerce's determination relied on flawed rationales and is unsupported by substantial evidence.

Even setting aside *Bell Supply*, Commerce's substantial-transformation analysis was unreasonable and unsupported by substantial evidence.

*First*, Commerce's reliance on FRCs not being "permanently affixed" leads to the absurd conclusion that railcars (and many other assembled products) have almost no parts and would radically expand the scope of the antidumping laws. Wabtec Br. 42–45. The Government gives *no answer* to these objections, instead myopically focusing on whether there is factual support for the undisputed point that FRCs need to be replaced from time to time. Gov't Br. 31–32, 34–35. And although Petitioner insists Commerce's reasoning would not equate the Ship of Theseus with a heap of planks, it identifies no *limiting principle* in Commerce's reasoning ruling out that conclusion. Pet'r Br. 33–34. *Ipse dixit* is not argument.

*Second*, Commerce's finding that FRCs are not physically altered when attached is indefensible. Neither Defendant even tries to show Commerce adequately responded to the objection that the attachment of uncoupling levers is a physical change. Wabtec Br. 45. Nor do they identify any point where Commerce cited evidence showing FRCs undergo no changes *when attached*. *Id.* at 45–46; *see* Gov't Br. 35 n.13 (asserting only that there is "substantial evidence" that FRCs "are not altered *when removed*" (emphasis added)).

*Third*, even if factually supported, Commerce's lack-of-alteration rationale is unreasonable because many inputs form part of a single integrated product without being physically changed, as this Court's cases have held. Wabtec Br. 46–47. The Government again tries to sidestep *MacLean Power* and *Trendium* on the ground that

**PUBLIC VERSION**

they involved scope *rulings*.  Gov't Br. 35–36.  But although those cases interpreted rather than defined scope language, they still had to determine that the otherwise in-scope merchandise combined with other inputs "to create a unique product," despite the lack of physical alteration.  *MacLean Power*, 359 F. Supp. 3d at 1372; *accord Trendium*, 399 F. Supp. 3d at 1343 n.3.  Petitioner again relies on *ipse dixit*, insisting "the bolts of a railcar" may be substantially transformed when attached, while failing to identify a principle in Commerce's reasoning that would allow for the disparate treatment of bolts and couplers.  Pet'r Br. 34.

*Finally*, neither Defendant disputes that remand is necessary if just one of Commerce's rationales is flawed.  Wabtec Br. 47.

## CONCLUSION

Commerce's *Final Determination* should be remanded.

**PUBLIC VERSION**

Respectfully submitted,

*/s/ David M. Morrell*
David M. Morrell
Ryan M. Proctor
Shelbie M. Rose

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated: May 17, 2024

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Wabtec's Memorandum of Law in Support of its 56.2 Motion, as computed by Jones Day's word processing system Microsoft Word 2013, is 6,938 words, less than the 7,000 word limit.

_/s/ David M. Morrell_
David M. Morrell

Dated: May 17, 2024

*Counsel for Wabtec Corporation*