## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

———————————————————— x
               :

WABTEC CORPORATION         :

          *Plaintiff,*     :

    *and* STRATO, INC.,     :     Court No. 1:23-cv-00160

     *Plaintiff- Intervenor*  :

       v.        :     **PUBLIC DOCUMENT**

UNITED STATES,       :

      *Defendant,*    :

    *and*         :

COALITION OF FREIGHT   :
COUPLER PRODUCERS,    :

    *Defendant-Intervenor*.  :

               :
               :
———————————————————— x

## SUPPLEMENTAL BRIEF OF WABTEC CORPORATION

David M. Morrell
Shelbie M. Rose

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated: January 24, 2025

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... ii

ARGUMENT ...................................................................................................................... 1

I.    By statute, Commerce alone defines the scope of investigations and any final orders, which excludes any role for the Commission to narrow the scope based on whether injury due to a subset of in-scope merchandise is cognizable. .............................................................. 1

II.    Every statutory element imposes a substantive limit on Commerce's discretion to define the scope of an investigation and any final order.......................................................... 6

III.    Commerce has historically distinguished between classes or kinds of merchandise based on the *Diversified Products* factors.  To the extent it wants to depart from that practice, it must still use an ascertainable standard, and acknowledge and justify the departure from its usual practice.................................................................................................................... 7

CONCLUSION................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page**

CASES

*A.L. Patterson, Inc. v. United States,*
   585 F. App'x 778 (Fed. Cir. 2014) ..........................................................................6

*Canadian Solar, Inc. v. United States,*
   918 F.3d 909 (Fed. Cir. 2019)..............................................................................14

*Crawfish Processors Alliance v. United States,*
   483 F.3d 1358 (Fed. Cir. 2007)........................................................................10, 12

*Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n,*
   844 F.3d 1334 (Fed. Cir. 2016)........................................................................1, 3, 4

*Kyocera Solar, Inc. v. United States,*
   253 F. Supp. 3d 1294 (CIT 2017) .........................................................................15

*M S Int'l, Inc. v. United States,*
   32 F.4th 1145 (Fed. Cir. 2022) ..............................................................................1

*Maclean Power, LLC v. United States,*
   359 F. Supp. 3d 1367 (CIT 2019).......................................................................9, 11

*Mid Continent Nail Corp. v. United States,*
   725 F.3d 1295 (Fed. Cir. 2013).........................................................................8, 9

*Mitsubishi Elec. Corp. v. United States,*
   898 F.2d 1577 (Fed. Cir. 1990)............................................................................15

*Mosaic Co. v. United States,*
   659 F. Supp. 3d 1285 (CIT 2023) .........................................................................10

*Nucor Corp. v. United States,*
   296 F. Supp. 3d 1276 (CIT 2018) .....................................................................1, 10

*OMG, Inc. v. United States,*
   972 F.3d 1358 (Fed. Cir. 2020)............................................................................10

*SunEdison, Inc. v. United States*,
    179 F. Supp. 3d 1309 (CIT 2016) ............................................................8

*Torrington Co. v. United States*,
    747 F. Supp. 744 (CIT 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) ......................1

*USEC Inc. v. United States*,
    34 F. App'x 725 (Fed. Cir. 2002) ............................................................1

**STATUTES**

18 U.S.C.
    § 542 ....................................................................................6

19 U.S.C.
    § 1592 ...................................................................................6
    § 1671(a)(1) .............................................................................6
    § 1671a(a) ..........................................................................1, 6, 7
    §§ 1671d, 1671e .........................................................................6
    § 1671e(a)(2) ............................................................................1
    § 1673d(b)(1)(B) ........................................................................3
    § 1677(25) ...............................................................................7
    § 1677k ..................................................................................7

**OTHER AUTHORITIES**

19 C.F.R. § 351.225(k)(2) ....................................................................8

*Antidumping Duty Order*, 81 Fed. Reg. 55,436, 55,437 (Aug. 19, 2016) ......................3

*Certain Fresh Cut Flowers From Colombia; Final Results of Antidumping Duty
    Administrative Review*, 55 Fed. Reg. 20,491, 20,499, Cmt. 49 (May 17, 1990) ...................12

*Certain Quartz Surface Products from the People's Republic of China: Final
    Scope Comments Decision Memorandum*  (May 10, 2019) .......................................8

Commerce's *Final Determination* ...........................................................15

*Final Determination of Sales at Less Than Fair Value; Limousines From Canada*,
    55 Fed. Reg. 11,036, 11,040 (Mar. 26, 1990).............................................12

IDM, *Certain Softwood Lumber Products From Canada* ..........................................7

*Initiation of Countervailing Duty Investigation: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 67 Fed. Reg. 70,927, 70,928 (Nov. 27, 2022) ........................................................................................12

ITC, *Carbon and Certain Alloy Steel Wire Rod From China, German, and Turkey* ....................2

ITC, *Circular Seamless Stainless Steel Hollow Products from Japan* ..........................................2

ITC, *Citric Acid and Certain Citrate Salts from Belgium, Colombia, and Thailand* ....................2

*Softwood Lumber from Canada*, 82 Fed. Reg. 51,806 ...................................................................8

Plaintiff Wabtec Corporation respectfully submits this supplemental brief in response to the Court's Minute Order issued on December 20, 2024.

## **ARGUMENT**

I.    **By statute, Commerce alone defines the scope of investigations and any final orders, which excludes any role for the Commission to narrow the scope based on whether injury due to a subset of in-scope merchandise is cognizable.**

A petition may propose a scope for an investigation, but Commerce "alone" defines the class or kind of merchandise that is subject to investigation and covered by a final order.  *M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2022).  This authority not only extends to the scope of Commerce's own investigation into subsidies and dumping, but dictates the scope of the Commission's material-injury investigation as well.  *See, e.g.*, *USEC Inc. v. United States*, 34 F. App'x 725, 730 (Fed. Cir. 2002) ("{I}t is Commerce's investigation that defines the scope of the ITC's analysis."); *Nucor Corp. v. United States*, 296 F. Supp. 3d 1276, 1282 (CIT 2018) ("{I}t is Commerce, not the ITC, that determines the 'class or kind' of imported merchandise that will be subject to investigation.").  This allocation of authority flows from the text of the statute. Commerce alone initiates an investigation to determine "whether the elements necessary for the imposition of a duty … exist."  19 U.S.C. § 1671a(a).  And Commerce alone defines the "subject merchandise" to which final orders will apply.  19 U.S.C. § 1671e(a)(2).

Under this statutory scheme, the Commission has no authority to modify the scope of an investigation or order even if it believed that a subset of in-scope imports are not a cause of injury, or legally cognizable injury, to the domestic industry.  *See USEC Inc.*, 34 F. App'x at 730; *Torrington Co. v. United States*, 747 F. Supp. 744, 748 (CIT 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) ("the ITC does not have the authority to modify the ITA's finding of class or kind").  The Commission is bound to make its injury determinations "with respect to the subject merchandise," *as Commerce has defined it.  Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*, 844 F.3d 1334, 1339

1

(Fed. Cir. 2016).  The Commission has no authority to subdivide merchandise based on misgivings about the validity of certain theories of injury embodied in the scope.

In practical terms, once Commerce concluded that couplers sold into Mexico for attachment to new railcars made in Mexico were in scope, the Commission had to collect import data on those couplers, along with unattached couplers, and incorporate *all* of those data into its overall investigation and determination.  The Commission reached an affirmative injury determination based on that data, finding all couplers (attached in third countries and unattached) to be a source of injury to the domestic industry.  Even if the Commission believed that any injury attributable to *attached* couplers was not legally cognizable, or even that attached couplers did not contribute to injury at all, the Commission had no mechanism to effectuate that judgment in the scope of the final orders.  Once the Commission finds some in-scope imports to cause material injury, final orders necessarily cover the entire scope, notwithstanding the lack of injury attributable to a subset of that merchandise.  *See, e.g.*, ITC, *Citric Acid and Certain Citrate Salts from Belgium, Colombia, and Thailand*, 2018 WL 3471344, at *21 (Final) (July 2018) (finding material injury even though "there is a small portion of the market in which the domestic industry does not compete"); ITC, *Carbon and Certain Alloy Steel Wire Rod From China, German, and Turkey*, 2006 WL 278280, at *9 (Prelim.) (2006) (explaining that, even where a domestic producer does not make a segment of in-scope merchandise, the Commission "has no authority to exclude product from the scope"); ITC, *Circular Seamless Stainless Steel Hollow Products from Japan*, 2001 WL 1700001, at *2 n.6 (2001) (in case where "at least 20 percent of subject imports are of types not produced domestically," finding material injury "{n}otwithstanding the attenuated competition between ***some*** subject imports and the domestic like product for ***some*** range of product" (emphases added)); *see also* Tr. 43 (Ms. Bond).

By statute, some ITC determinations can impact the reach of final orders. In multi-country cases, the Commission can "terminate{}" an investigation with respect to any country whose imports are "negligible," 19 U.S.C. § 1673d(b)(1)(B), or find injury due to imports from one country but not another in cases where the Commission declines to cumulate imports from those countries, *id.* § 1677(7)(G). In either scenario, Commerce would not enter a final order against imports from the relevant country. Similarly, the Commission can define two or more domestic industries, corresponding to two or more domestic like products, and find that one domestic industry suffered material injury and the other did not. *Id.* § 1677(4)(A), (10). In that scenario, Commerce would remove the merchandise produced by the non-injured domestic industry from the scope of the final order. *See, e.g.*, *Hydrofluorocarbon Blends From the People's Republic of China: Antidumping Duty Order*, 81 Fed. Reg. 55,436, 55,437 (Aug. 19, 2016). Apart from these limited, statutorily defined circumstances, ITC determinations do not impact the universe of merchandise and countries subject to antidumping and countervailing duties.

None of these types of determinations, however, allowed the Commission to exclude attached couplers from the scope of the final orders here. Negligibility and cumulation determinations can affect the *countries* subject to a final order; and defining two or more domestic industries can result in the exclusion of merchandise corresponding to that produced by *a non-injured domestic industry*. But none of these statutory determinations turn on whether a subset of in-scope merchandise is addressed to a non-cognizable theory of injury—namely, lost export sales. Thus, even if the Commission believed that any injuries attributable to attached couplers were non-cognizable, it had no mechanism to effectuate that judgment in the scope of the final orders.

The Commission's handling of an analogous scenario involving solar modules, blessed by the Federal Circuit, confirms the point. *See Kyocera Solar, Inc.*, 844 F.3d 1334. In an investigation

into solar modules from *Taiwan*, Commerce defined the scope to include certain imports from *Mexico* (namely, those made with Taiwanese solar cells).  Respondents argued that this aspect of the scope was legally infirm because solar modules produced in Mexico could not be included in a case against Taiwan.  *Id.* at 1336.  Having lost that argument before Commerce, respondents argued that the Commission had to conduct a separate negligibility analysis for imports from Mexico.  *Id.* at 1336–37.  The statute defines "negligible imports" as "***imports from a country*** of merchandise … account{ing} for less than 3 percent of the volume of all such merchandise imported into the United States …." 19 U.S.C. § 1677(24) (emphasis added).  Even though the Commission alone determines whether "imports from a country" are "negligible," the Commission disclaimed any authority to distinguish between imports from Mexico and imports from Taiwan in conducting this analysis.  The lead reason: "'the Commission must defer to Commerce's definition of the scope of the merchandise subject to these investigations.'"  *Kyocera*, 844 F.3d at 1337 (quoting ITC determination).  Because Commerce had determined that imports from Mexico should be treated as "subject merchandise" from Taiwan, the Commission denied any authority to distinguish between imports from Mexico and Taiwan, even when making the statutory determinations expressly entrusted to it.  *See id.*  The Federal Circuit affirmed the Commission's approach, concluding that Commerce's authority to define scope unambiguously prevented the Commission from distinguishing between imports from Mexico and Taiwan even when conducting its own statutory analysis (if Commerce had not deemed imports from Mexico to be imports from Taiwan, then the Commission would have considered each country separately in conducting its negligibility analysis).  *Id.* at 1340 ("Here, the statute plainly requires that the Commission make its determinations with regard to subject merchandise.  And the statute vests Commerce with the role of determining the scope of the merchandise subject to investigation.").

4

Similar is true here.  Commerce defined all couplers—attached and unattached—as "subject merchandise."  This bound the Commission to investigate both types of imports and to cast an up-or-down vote regarding injury.  Once the Commission found unattached couplers to cause material injury, it had no discretion to exclude attached couplers from the scope of the final orders, even if the Commission believed they were not a source of injury.  Just as the Commission had no authority in *Kyocera* to distinguish between imports from Mexico and Taiwan once Commerce deemed both to be imports from Taiwan, the Commission had no authority to narrow the scope based on distinctions between unattached and attached couplers, cognizable and non-cognizable theories of injury.  In other words, the Commission, as a matter of law, had to analyze the impact on the domestic coupler industry of Chinese-made couplers sold to customers in the United States and of Chinese-made couplers sold to railcar manufactures in Mexico and incorporated into Mexican-made railcars that were exported to the United States.

The foregoing also illustrates why the Court's summary-judgment analogy breaks down.  A court has plenary authority to conform its final order or judgment to the contours of its summary-judgment decision: a court can enter judgment on some claims and send other claims to the jury.  Here, by contrast, the statutory scheme does not afford the Commission this discretion.  Commerce alone defines the scope of the investigation and any final order.  And, apart from a defined set of ITC determinations—negligibility, cumulation, domestic industry—Commerce will not exercise that authority to narrow the reach of a final order based on Commission views.

In short, even though the Commission could determine whether attached couplers injure the domestic industry, the Commission would have no authority to modify the scope based on a negative finding on that point.  Commerce would still have imposed an order against all in-scope couplers—including those attached to rail cars.  Because Commerce alone initiates investigations

to determine "whether the elements necessary for the imposition of a duty … exist," and alone defines the "subject merchandise" to which final orders will apply, Commerce had an obligation to screen out non-cognizable theories of injury. Its failure to do so is an independent ground to remand its decision with directions to remove attached couplers from the scope.

## II.    Every statutory element imposes a substantive limit on Commerce's discretion to define the scope of an investigation and any final order.

The trade-remedy statute sets forth a highly complex, reticulated scheme that allocates authority between Commerce and the Commission. But the place where the rubber hits the road for regulated parties is the final order. The final order is the mechanism by which duties are imposed. *E.g.*, 19 U.S.C. §§ 1671d, 1671e. It is binding on regulated parties, and violations carry civil and criminal penalties. 19 U.S.C. § 1592; 18 U.S.C. § 542. Thus, as a matter of statutory structure and logic, the terms of a final order must be consistent in all respects with the statutory scheme. If Commerce determines that some "element{} necessary for the imposition of a duty" does *not* exist, 19 U.S.C. § 1671a(a), Commerce plainly cannot issue the order. *See, e.g.*, *A.L. Patterson, Inc. v. United States*, 585 F. App'x 778, 785–86 (Fed. Cir. 2014).

While this conclusion applies across all elements of the statute, two are particularly relevant here. The purpose of U.S. trade remedy laws is to protect the domestic industry from unfair competition in the U.S. market, not in a third market, whatever the spillover effects might be. This is evident throughout the text of the statute, which focuses Commerce's investigation on merchandise that is dumped or subsidized and "imported or sold (or likely to be sold) for importation … into the United States" and focuses the Commission's investigation on injury "by reason of imports" of subject merchandise into the United States. 19 U.S.C. § 1671(a)(1); *id.* at § 1671(a)(2). Commerce thus had no discretion to define the scope to include merchandise that competed with the domestic industry for sales in Mexico, as Commerce itself recognized in

refusing to treat "U.S. export shipments" as part of the "total U.S. market." Appx2561; *see also* Wabtec Opening Br. 22–26. Congress eliminated any doubt by enacting another statute expressly addressed to that scenario. *See* 19 U.S.C. § 1677k.

Another relevant limit on Commerce's authority to define scope is the statute's reference to a "class or kind of merchandise," the term that defines the scope of an investigation and any final order. 19 U.S.C. § 1677(25). Based on this language, Commerce has long held that final orders are limited to a single "class or kind of merchandise." *See, e.g.*, IDM, *Certain Softwood Lumber Products From Canada*, 82 Fed. Reg. 51,806, IDM (Nov. 8, 2017) ("AD and CVD orders cover only one class or kind of merchandise."). This also follows from the structure of the statute. Commerce cannot issue a final order unless all "elements necessary for the imposition of a duty … exist." *See* 19 U.S.C. § 1671a(a). The frame of reference for determining this is a definition of subject merchandise. Without such a frame of reference, defined around a "class or kind of merchandise," it is unclear how Commerce would ever determine whether the statutory elements for an order exist. The agencies could not make their respective findings if the scope included a grab bag of disparate merchandise, ranging from bicycles and refrigerators to tires and bananas. So while petitioners can file multiple, separate cases, all the products falling within a particular order must belong to the same "class or kind of merchandise." Tr. 79 (Ms. Bond).

**III.    Commerce has historically distinguished between classes or kinds of merchandise based on the *Diversified Products* factors.  To the extent it wants to depart from that practice, it must still use an ascertainable standard, and acknowledge and justify the departure from its usual practice.**

**1.** Because a final order is limited to a single "class or kind of merchandise," principles of administrative law require Commerce to use an "ascertainable standard" to distinguish between classes or kinds of merchandise. *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1305 (Fed. Cir. 2013). Arbitrary, "ad hoc determinations" will not do. *Id.* at 1304.

Commerce's longstanding practice is to distinguish between classes or kinds of merchandise based on the five *Diversified Products* factors. Commerce has codified this test in its regulations governing scope rulings. 19 C.F.R. § 351.225(k)(2). But it has used the same test in the scope-determination context for the express purpose of ensuring that final orders are limited to a single class or kind of merchandise, regardless of what a petition has proposed:

> Regardless of whether a product is covered by a proposed scope during an investigation, pursuant to section 731 of the Act, AD and CVD orders cover only one class or kind of merchandise. Thus, if [specific product] were found to be a different class or kind of merchandise from all other in-scope merchandise during this investigation, the Department would have to determine if a separate AD and CVD order is appropriate to solely cover [such product]. As noted above, the Department has the authority to determine if a product, although covered by the proposed scope of an investigation, is a different class or kind of merchandise from the other products covered by the proposed scope.

*Certain Softwood Lumber from Canada*, 82 Fed. Reg. 51,806, IDM cmt. 15 (Nov. 8, 2017) (citing *Torrington* and *Diversified Products* criteria); *see also Certain Quartz Surface Products from the People's Republic of China: Final Scope Comments Decision Memorandum*, at 7–8 (May 10, 2019) (citing *Diversified Products*).

Commerce itself has thus identified the appropriate test for answering the class-or-kind question. Its failure to apply that test—or at least to explain why it was refusing to do so—alone requires remand of its decision here. *See, e.g.*, *SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1317 (CIT 2016) ("'[W]hen departing from its own precedent, Commerce must explain its departure,' providing a rational link between the facts found and the conclusions reached, after considering all important aspects of the problem.").

**2.** Even apart from *which* test to apply, Commerce's scope determination implicates another, closely related question—namely, *how* Commerce should apply the test it chose? More specifically, what are the relevant comparators in the class-or-kind inquiry? In its scope decision,

Commerce denied that the "'legally relevant inquiry' is whether a freight rail **coupler** is a separate class or kind of merchandise from a freight **railcar**." Appx6555 (emphases added). And, in its briefing and at argument, DOJ doubled-down that the relevant comparison is not the coupler and the railcar, but the coupler and the coupler. DOJ Br. at 34; Tr. 86, 131–32, 134 (Ms. Bond). The reason DOJ must defend this line is obvious: once the comparison is between a coupler (the upstream product) and a railcar (the downstream product), the answer is beyond dispute: couplers and railcars are clearly separate classes or kinds of merchandise and thus could not fall within a single order. The question, then, is whether Commerce should have compared couplers to couplers (as Commerce did), or couplers to railcars (as respondents insisted). For the reasons that follow, Commerce should have compared couplers to railcars regardless of the test it chose to apply.

a. Commerce agrees that orders must be limited to a single class or kind of merchandise. And since orders only apply to merchandise upon importation, Commerce must necessarily determine whether a single proposed order would sweep in more than one class or kind of merchandise upon importation.

To answer that question, Commerce must first determine what the product coming across the border *is*. Is the product "a single, unitary item, or a mere aggregation of separate items"? *Mid Continent*, 725 F.3d at 1298. So, for example, is a tool kit that contains a nail a single, unitary item (i.e., a tool kit) or an aggregation of items (i.e., nails plus other items)? *Id.* at 1305. Is pole line hardware a unitary item (i.e., pole line hardware) or an aggregation of items (i.e., washers plus other components)? *Maclean Power, LLC v. United States*, 359 F. Supp. 3d 1367, 1372 & nn. 3–4 (CIT 2019). If the imported merchandise is a combination of *distinct* articles, then only one of those articles can be subject to a single order (that is, unless the distinct articles happen to belong to the same class or kind of merchandise). If the merchandise is a unitary article, then it cannot be

included in a single order with *another* unitary article without violating the one-class-or-kind principle (again, unless both articles happen to belong to the same class or kind of merchandise). Critically, Commerce cannot "look through" (so to speak) unitary articles and subject only an input or component to a duty: in the eyes of the law, the input in a unitary item no longer exists. *See OMG, Inc. v. United States*, 972 F.3d 1358 (Fed. Cir. 2020); *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1363 (Fed. Cir. 2007); *accord Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1295 (CIT 2023) (calling into question order imposing duties "only upon an ingredient in the imported merchandise").

An example illustrates the point.  In *OMG*, the Federal Circuit held that a zinc anchor fell outside the scope of an order on "nails" even though all agreed that one component of the anchor, a steel pin, "fit{} within the common definition of a nail."  972 F.3d at 1362–63.  Because zinc anchors were "unitary items," they had to be treated as such; Commerce could not focus on the "steel pin" in the larger product.  *Id.* at 1364–65.  As this Court put it, where unitary articles are concerned, "the entire product, not just a component part, must be defined as [the subject article] to fall within the scope of the orders."  *OMG, Inc. v. United States*, 321 F. Supp. 3d 1262, 1269 (CIT 2018).  This analysis makes sense only if the input (there, a steel pin) lost its identity—ceased to exist—when incorporated into the downstream product (the zinc anchor).

Though Commerce did not spell this out in so many words, much of this was implicit in its decision.  Commerce's ultimate reason for including attached and unattached couplers within the scope was its belief that a coupler's "attachment to freight railcars does not turn freight rail couplers into *a new article of commerce*."  Appx6554 (emphasis added).  The implication is that if attachment *did* turn couplers into "a new article of commerce"—i.e., a railcar—then the order would not have included them, presumably because of the one-class-or-kind principle.  DOJ

echoed this basic point at the hearing, suggesting that the "simple question" is whether a coupler "remains the same class or kind of merchandise whether it's attached to a railcar or not attached to a railcar." Tr. 80–81(Ms. Bond); *see also id.* at 85–86 (similar).

This framework also makes sense of the scope-ruling cases has Wabtec cited. In *MacLean Power*, this Court faulted Commerce for "put{ting} the cart before the horse" by failing to **first** ask "what the imported item is"—a "unique" product or a "mixed media item"? 359 F. Supp. 3d at 1372 & nn. 3–4. Since the Court held that the subject washers and other hardware created a "unique product," the pole line hardware (including its washers) fell outside the order covering "washers." *Id.* at 1372–73. Likewise, in *Trendium Pool Products, Inc. v United States*, this Court faulted Commerce for skipping the "threshold inquiry" of whether the imported item—finished pool kits—were "a single, unitary item, or a mere aggregation of items." 399 F. Supp. 3d 1335, 1343 & n. 3 (CIT 2019). Since the pool kits were unitary items, they—including the corrosion resistant steel (CORES) used to make them—fell outside the order covering CORES. *Id.* And while these are scope-ruling cases, the same principles must underlie scope determinations. Whether drafting an order or interpreting an order, the same rules must apply for the system to be coherent, just as the same rules of grammar and meaning apply to Congress and courts alike.

All of this raises a critical question: how should Commerce determine whether a product is a unitary article or part of a combination of distinct articles? In concrete terms, how should Commerce determine whether an "attached coupler" has merged into a unitary railcar (as Wabtec claims) or is a distinct article from a railcar (as Commerce claims)? This question is fundamental. If an "attached coupler" has merged into a unitary article (i.e., a railcar), it plainly cannot be included in an order covering couplers without violating the one-class-or-kind principle.

**b.**  In this case, Commerce attempted to answer the foregoing question—whether an attached coupler has merged into a unitary article or remains a distinct article—by applying the substantial-transformation test.  Commerce did not venture a reason for selecting this test, but simply asserted that "couplers are not substantially transformed into a distinct class or kind of merchandise when they are attached to a freight railcar" and thus remain an "article of commerce" distinct from the railcar.  Appx6554–55.  Even assuming the test was appropriate, Commerce's application was fundamentally wrong.

Commerce has used the substantial-transformation test in a variety of contexts, but has invariably (to our knowledge) applied the test by comparing the upstream product (the input) to the downstream product (the finished product).  So, for example, Commerce has compared automobile chasses to limousines,[1] flowers to bouquets,[2] and crawfish tail meat to etouffee.[3]  In each of these cases, Commerce found a substantial transformation.  In other cases, such as with wafers and semi-conductors,[4] Commerce did not find substantial transformation.  But in all cases the comparison was the same—Commerce compared the upstream to the downstream product.

Not so here.  Commerce deployed an unprecedented and indefensible version of the substantial-transformation test by teeing up a comparison between the couplers themselves—that is, the attached couplers versus unattached couplers.  But by refusing to compare the unattached

---

[1] *Final Determination of Sales at Less Than Fair Value; Limousines From Canada*, 55 Fed. Reg. 11,036, 11,040 (Mar. 26, 1990).

[2] *Certain Fresh Cut Flowers From Colombia; Final Results of Antidumping Duty Administrative Review*, 55 Fed. Reg. 20,491, 20,499, cmt. 49 (May 17, 1990).

[3] *Crawfish Processors Alliance*, 483 F.3d at 1363.

[4] *Notice of Initiation of Countervailing Duty Investigation: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 67 Fed. Reg. 70,927, 70,928 (Nov. 27, 2022).

couplers (the input) to the railcar (the finished product), Commerce effectively loaded the dice by presuming the answer to the question it was purporting to ask.

The sole justification Commerce gave for its coupler-versus-coupler framing was not precedent or case law, but the scope proposed in the petition. Commerce felt free to ignore the downstream product in its inquiry because "the scope does not cover freight railcars." Appx6555. But *that is the very question* to be answered by Commerce: is a scope that *purports* to include attached couplers *in fact* covering railcars? And the answer to that question depends on what the product coming across the border is—*in fact, in reality*. Is an "attached coupler" part of a unitary article (a railcar) or is a railcar an aggregation of multiple components? These are questions for Commerce to answer by applying law to fact, not conclusions to be dictated by petitioners.

If this kind of reasoning is allowed to stand, then nothing would stop petitioners from pleading around inherent limits in the statutory scheme. Petitioners insisted that Commerce could target tires on imported cars. Tr. 92 (Ms. Webster). But why stop there? By their logic, based on nothing more than petitioner desires, Commerce would have to include nails in furniture, bolts in cargo ships, and washers in pole line hardware. There is a reason *all* of the examples Petitioners have cited to justify this approach were only issued since 2020. Appx6350–51; Petr's Br. 28–29. Petitioners have pushed the boundaries of the statute to include more and more downstream products in scope. But the apparent lack of historical pedigree for this approach is reason to be suspicious—and the patent lack of foundation in the statute is reason to reject it.[5]

---

[5] At the hearing, Petitioners' counsel claimed that the only limit is set by the practical problem of proof at the Commission. Petitioner claimed that including downstream products within scope forces petitioners "to prove that people are buying the {downstream product} because the {subject inputs} on them are cheaper." Tr. 103 (Mr. Pickard). That is false, as shown in this very case. The Commission did not collect information on the market for new railcars, much less the role coupler prices play in the purchase of new railcars. Nor would that have made any sense. Why would *railcar sales* lost *by railcar builders*—which are not part of the domestic

Commerce's "reasoning" here—defer to petitioners—would nullify other limits as well. For example, petitioners could state in the scope that widgets from, say, Thailand are Chinese origin and therefore within the scope of an investigation against China, even if those widgets had no connection to China whatsoever. By Commerce's logic, regardless of whether those widgets are *in fact* Chinese origin—based on some ascertainable legal standard applied to the facts— respondents cannot object once the petition has spoken. It is one thing if Commerce determined, after applying law to facts, that such widgets are in fact Chinese origin. But it is quite another to allow petitioners to plead around the issue altogether. Petitioners cannot dictate country of origin through its petition, any more than a tort plaintiff can dictate what qualifies as negligence through a complaint. If they could, the result in *Torrington* (and many other cases) would make no sense: the petition there *claimed* that all merchandise described in the petition (antifriction bearings) was of a single class or kind, yet this Court upheld Commerce's conclusion that the petition in fact covered five different classes or kinds of merchandise. *See* 747 F. Supp. at 719–20, 728–29.

At the hearing, the government touted the Federal Circuit's decision in *Canadian Solar, Inc. v. United States*, 918 F.3d 909 (Fed. Cir. 2019), claiming it blessed Commerce's anything-goes approach. *See, e.g.*, Tr. 42, 87, 90, 127. But that case proves our point. There, even though the petition against China *claimed* that solar modules assembled in China using non-Chinese cells were Chinese origin, it was Commerce, not the petition, that "determine{d} the country of origin" of the merchandise proposed for investigation. *Canadian Solar, Inc.*, 918 F.3d at 915. The entire exercise would make no sense if petitions can dictate country of origin simply by declaring it.

---

industry—figure into injury suffered by *coupler* manufacturers? In any case, as detailed in Part I, the Commission had no mechanism for excluding attached couplers from the final order, even if it agreed that they were not a source of material injury.

In reality, petitions may express an intent, but Commerce alone must define the scope. *See, e.g.*, *Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("The responsibility to determine the proper scope of the investigation and of the antidumping order … is that of {Commerce}, not of the complainant before the agency."). Here, Commerce outsourced its responsibility by allowing artful pleading to dictate the conclusion of an inquiry Commerce had a duty to conduct itself: namely, what is the product coming across the border—a unitary article (i.e., railcar) or an aggregation of articles (railcar components, including couplers)—and does that product fall within the same class or kind of merchandise as in-scope unattached couplers?

**3.** Finally, even if Commerce properly framed the inquiry—coupler versus coupler—it still erred by reducing the "class or kind" inquiry to a single question, whether the coupler underwent a substantial transformation. Commerce did not cite any precedent or offer any rationale for departing from the *Diversified Products* factors typically used in scope determinations. While substantial transformation is one factor under *Diversified Products*, there are four others Commerce ignored. Moreover, even if substantial transformation were the right test, Commerce did not cite, much less apply, the traditional factors composing that test. Wabtec Br. 41–42; Wabtec Reply Br. 22–23. If Commerce wanted to apply a novel version of either test, it at minimum needed to acknowledge that it was doing so and offer a sufficient rationale for departing from prior practice. *See Kyocera Solar, Inc. v. United States*, 253 F. Supp. 3d 1294, 1308 (CIT 2017). Since Commerce failed to do either, this is an independent basis to remand.

## <u>CONCLUSION</u>

For these reasons and those set forth in Wabtec's prior briefing, Wabtec requests that this Court hold that Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law, and remand with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

*/s/ David M. Morrell*
David M. Morrell
Shelbie M. Rose

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
1.202.879.3636
dmorrell@jonesday.com

*Counsel for Wabtec Corporation*

Dated:  January 24, 2025

16

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Supplemental Brief, filed on January 24, 2025 complies with the page count limitation requirement issued in Judge Vaden's Minute Order dated December 20, 2024.   The page count for Wabtec's Supplemental Brief, is 15 double spaced pages.

_/s/ David M. Morrell_
David M. Morrell

*Counsel for Wabtec Corporation*

Dated: January 24, 2025